CHARLES L. BEACH AND OTHERS, RESPONDENTS, *v.* THE RARITAN & DELAWARE BAY RAILROAD CO., IM-PLEADED WITH WM. H. MELLEN, APPELLANTS.

*Contract — Telegram — Parol Evidence.*

Where parties have met and negotiated in respect to the letting of a barge for the term of six months, and have agreed upon all the terms except as to the *price* to be paid for its use, and have parted with the understanding that the conclusion of a party as to accepting the price proposed is to be communicated by telegraph, such previous negotiations may be inquired into to explain the extent and limitation of the telegram.

Such telegram is not to be deemed a reducing of the contract between the parties to writing, and as such incapable of explanation by an inquiry into the preliminary negotiation.

APPEAL from judgment upon a verdict for the Plaintiffs, affirmed by the Supreme Court, in General Term of the Third District.

The Plaintiffs being owners in possession of the barge called the "Globe," let it to the Defendant Mellen on the 19th of March, 1860, until the first of October thereafter, for the price or "rent" of $400.

On or about the 5th of September, the Appellants, the railroad company, without the knowledge or consent of the Plaintiffs, and, according to Appellants' evidence, on the representation and in the belief that Mellen was owner, hired the barge from Mellen, at $5 per day, for the purpose of transporting railroad iron therein from the ship America, then in the port of New York, to Port Monmouth, in New Jersey; and on the 5th or 6th of September she was taken from the slip and placed alongside of the ship America, and the loading with iron was begun. After receiving 200 tons or upward she was found to be sinking, when she was moved into or near to a slip at the foot of Spring street, where she sunk in about five feet of water, at low tide.

While in this condition, and with the iron still on board, and on

8

or about the 2d of October, the Plaintiffs demanded the barge from Mellen " in as good condition as she was when delivered."

His answer was, "that he could not deliver her," and in the same conversation stated that "the barge was sunk."

On the same day the Plaintiffs demanded the barge from the Appellants (the railroad company) at their office in New York, and received for answer from the director and agent in charge, and by whom she was hired from Mellen—according to the testimony of one of the Plaintiffs' witnesses—that " she was sunk, and he could not deliver her."

He acknowledged that the company had her. He said it was impossible to deliver her. He said he had hired her from Mellen, and he supposed Mellen was the owner of her. The same director being called and examined by the Plaintiffs, testified, on cross-examination, to his belief that Mellen was owner when he hired her, and that Mellen spoke of her as " my barge," and that when the agent of the Plaintiffs made the demand of him " he disclaimed all knowledge of them or accountability to them ;" and he further testified that " we had no control of her in October ; had no possession of her when demand was made."

It also appeared on the trial, that prior to the hiring for the transportation of the iron, Mellen had suffered the barge to be employed by the Appellants for transportation from New York to some place in New Jersey; and that, in July or August, the Plaintiffs having heard she was employed in carrying railroad cars, saw Mellen, and objected to such use of the barge, insisting that she should only be used in the slip as a receiving or store barge.

The Appellants removed a portion of the iron from the barge in or prior to December. Mellen testified that the railroad company refused to raise the barge, and he (Mellen), in obedience to the requirement of the " city officers," raised her the latter part of December, and that there was then between forty or fifty tons of iron on board.

The action was commenced on or about the 2d of October, alleging the facts above recited, characterizing the conduct of the Defendants as a conversion, and claiming damages $6,000.

No evidence was given of any return, or offer to return, the barge after she was raised. The answers of the Defendants put in ignore the material grounds on which they are sought to be charged.

The principal questions of fact touching the legal liability of the Defendants, contested on the trial, were : First—Whether the letting of the barge to Mellen was for a special and restricted use only, viz., employment as a receiving or store barge in his slip ? or for such general use as was suitable for a barge ? as Mellen, in his testimony, states, " In hiring the barge there was no restriction about it; as I understood it I was to use her as mine had been ; I had used mine to carry goods."

On this point the Plaintiffs and Mellen are in direct conflict in their testimony.

Second—Whether the sinking of the barge was owing to negligence of Mellen in his care of the barge, by omission to keep her properly caulked, and hiring her to the Appellants in an unsuitable or unseaworthy condition for use in transporting goods or iron ?

Third—Whether the sinking of the barge was owing to the improper, negligent, or unskilful manner in which the iron was placed on board of the barge ? it being claimed by the Plaintiffs, and also testified by Mellen, that the loading was not by distributing the iron equally, " so as to preserve an even keel," but by placing too much aft, while there was little in the centre or forward, she was strained, her seams opened, so that leaking ensued, and she was sunk; all of which was denied by the Appellants, who impute the sinking to the unseaworthiness of the barge when hired.

On the first point evidence was given of oral negotiations with the Plaintiffs, at Catskill, where they resided, out of which the Plaintiffs claim that the restrictions upon the use of the barge arose.

The Plaintiffs' final assent to the letting was communicated to Mellen at New York, by telegram.

These Plaintiffs testified that Mellen, on the 17th March, called

and stated " that his barge, which had been used as a store or receiving barge, had been burnt, and he wished to hire the Globe for that purpose; that he wanted her only for a receiving or store barge."

He asked their price. Plaintiffs conferred apart, and they proposed $500 till the 1st of November. He declined to give that, but offered $400.

Plaintiffs told him they would talk further, and telegraph to him to New York if they would consent to a reduction of price.

Another of the Plaintiffs states the interview thus : " Mellen applied for the lease of the barge; we inquired of him the use or purpose for which it was wanted; he said she was to be used as a receiving or storing barge, at New York, at slip first below ours, at New York city; price was fixed at $400; $500 was price named, and November 1, 1860, the time ; we told him we would not consent to lease the barge after 1st October; he objected to the $500; I don't recollect his making an offer; this was on Saturday; owners met on Monday to determine; on Saturday we agreed to reply our final conclusion by telegraph; the use was settled on Saturday; we were to communicate the price on Monday; we came to conclusion on Monday."

On Monday a dispatch to Mellen was sent by the Plaintiffs by telegraph, as follows :

" You may have barge Globe for $400 until October 1. Rent payable, $\frac{1}{2}$ 1st July, and $\frac{1}{2}$ 1st October.

" PENFIELD, DAY & Co.

" March 19th, 1860."

Without further negotiations Mellen took possession of the barge.

It was insisted on the trial that this dispatch is to be regarded as a written instrument defining the terms of the letting, and that all testimony to oral arrangements restricting Mellen to the use of the barge as a receiving or storing barge, was incompetent. To the ruling adverse to this claim the Appellants excepted.

Some other exceptions to the admission were taken on the trial by the Appellants, which are noticed in the opinion. · . .

Various exceptions were also taken by the Appellants to the charge to the jury.

The evidence as to the value of the barge was conflicting, and the jury found such value as damages in the verdict which they rendered for the Plaintiffs against both of the Defendants, for $3,210, for which, with costs, judgment was rendered. After affirmance thereof in General Term, the Defendant, the railroad company, appealed to this Court. . : . .

Woodruff, J.—The Defendants, by objections to evidence, and by request for instructions to the jury, insisted that the telegram sent by the Plaintiffs at Catskill, on Monday, the 19th of March, 1860, to Mellen (the lessee of the barge) in New York, is to be taken as the only legal evidence of the contract for the barge made with the Plaintiffs, and that therefore all proof of the oral negotiations or agreement made by Mellen with the Plaintiffs at Catskill, on the Saturday previous—March 17th—was inadmissible, and should be disregarded. .

This claim is important, because if the use in which Mellen was permitted by the terms of the letting to employ the barge was limited to an employment thereof in the slip as a receiving or storing barge, it was so limited by the oral treaty of Saturday, the telegram being entirely silent on that subject, and importing, if anything in relation to the use is to be inferred from it, that Mellen was at liberty to use her for any proper purpose for which vessels of that description are usually employed. · · ·

The rule of law invoked by the Appellants is, that where the contract of the parties is reduced to writing, all prior and contemporaneous oral negotiations or agreements are merged, and oral testimony is not admissible to either contradict, enlarge, or, if free from ambiguity, explain it.

To this rule both parties assent. Whether it is applicable to the present case, and operates to exclude the oral testimony, is the question in contest. · ·

When and to what extent dispatches sent by parties to each other by telegraph are to be treated as written contracts, or written evidence of their contracts, must depend upon the circumstances in which they are sent, and the intent and object for which they are transmitted and received.

Treating them most favorably to the view urged by the Appellants, they can have no higher or more conclusive effect than a letter sent by mail, in the same terms, would have.

The first question then is, was this telegram, according to the intent and understanding of the parties *at the time* when it was sent and received, the expression of the contract of the Plaintiffs?

This question is always an open one in regard to communications between parties, whether oral or written. If there is doubt upon that question, it may properly be left to the jury, and it was left to them in the present case.

For the determination of *that* question, it is competent to show the circumstances under which, and the purposes for which, it was sent, though it may not be competent to show, by parol, that in regard to its unambiguous provisions, the parties did not intend to contract according to its tenor.

And it is certainly competent to show that it was sent for the mere purpose of fixing one of the details of a proposed agreement, upon which the minds of the parties had not before concurred.

For example, a telegram is sent in these terms: "You may have the horse for $25."

It seems to be a provision of the rule referred to, that because such a dispatch, or such a communication by letter may, if unexplained, import a sale of the horse for $25, the owner may not show that the parties had previously met at a remote place and negotiated touching a hiring of the horse for six months, to be used as a coach-horse, and had parted with an understanding that a dispatch stating the price required should be sent to him.

Or suppose an oral application were made for the use of a horse, for four months, in light work before a pleasure-wagon, and the parties failed to agree upon the period or price of the service, but

separated with an understanding that the mind of the owner upon these two particulars shall be communicated either in writing or by telegram. Thereafter a dispatch or writing is sent in these terms : " We consent that you have the horse for three months for $30."

These examples are probably no more illustrative of the subject than the case before us, as claimed by the Respondents ; but I apprehend that in neither of them is it doubtful that the owner may show that the letter or dispatch was not sent or received as an expression of the whole contract, and to that end may prove that it was sent in answer to a previous either written or oral communication *made* to him, which should be read or taken with such reply in order that the whole contract may appear.

It would be a strange inconsistency if, where an entire negotiation is conducted by letter, the proposition of the one party may be read to determine the meaning of the acceptance by the other ; but if such proposition be oral, and a written reply be, for convenience, asked, the reply must be taken to bind the writer, without any reference to the proposition, or any aid therefrom, in particulars where the reply is silent—or, in other words, if the reply closed the door to inquiry, provided, if construed alone, it would be capable of receiving a legal signification.

Mr. Greenleaf, in defining that written evidence of a contract (vol. 1, § 275) to which the rule before mentioned is applicable, states it is " not everything which is in writing, but that only which is of a documentary and more solemn nature, containing the terms of a contract between the parties, and *designed* to be the *repository* and *evidence* of *their final intentions.*"

In Jeffery v. Walton (1 Stark. R. 267), where a written memorandum stated the period of the hiring of a horse, and the compensation, Lord Ellenborough said : " The written agreement merely regulates the time of hiring, and the rate of payment, and I shall not allow any evidence to be given in contradiction of these terms ; but I am of opinion that it is competent for the Plaintiff to give in evidence suppletory matter, as part of the agreement."

And in Potter v. Hopkins (25 Wend. 417), where the writing

did not on its face purport to be a complete agreement, it was held, that though binding so far as was expressed in terms, parol evidence was competent to show the whole contract.

The distinct ground upon which I place my opinion is, that where a proposition on one side is submitted, whether verbal or written, calling for an answer based on such proposal, the answer, though in writing, need not necessarily recite all the terms and conditions embodied in the proposal.

It is to be read in connection with the proposal to which it is a reply, and the whole together constitutes the contract between the parties.

Such written reply is no doubt conclusive, so far as the terms are expressed, but no further.

In such case the reply is neither made or received, nor understood to be, the expression of the whole contract.

This is in entire harmony with the rule as stated by Denio, J., in Renard *v.* Sampson (12 N. Y. 566).

For more full illustration let me suggest further examples— thus:

On the 31st of August, in an oral negotiation, A. proposes to B., " I wish to hire your barge now lying in New York, first of January, to be employed in transporting light hemlock bark only; I to recaulk her thoroughly before she is used, and newly paint her throughout, and deliver her to you, at the end of the term, at your dock in Catskill. Send me word by telegraph whether I can have her, and at what price."

Various answers by telegraph may be stated. Thus:

" You can have my barge for $300 ; " or, " You can have my barge until the 1st of January for $300 ;" " The rent of my barge will be $300, payable half down, and half 1st December."

Now, in each such case the parties never intended that their agreement should be in writing, further or beyond (at most) what is expressed in the telegram; and to say, that because the first supposed answer might, in the absence of explanatory proof, legally import a sale of the barge for a round sum, the owner cannot therefore prove the previous verbal proposal to which it

was a reply, is perverting a useful rule of evidence, and giving it an application for which it was never intended.

And if the owner in such case may show, by parol, that a letting, and not a sale, was intended, then he may also show all the terms of the letting, and the like reasoning must admit all the terms of the letting in each of the other cases, and upon the principle that the parties have not intended or attempted to put their agreement in writing.

There was therefore no error in receiving evidence of the oral proposition made by Mellen to the Plaintiffs at Catskill, to which the telegram was a reply; and the restrictions as to the use of the barge imported by such proposition, if any there were, formed a part of the contract between the parties.

But I think the Judge fell into an error in his instruction to the jury respecting the legal liability of the Appellants, by which the jury may have been misled.

He submitted to the jury the question, whether, by the contract of letting to Mellen, he was restricted to the use of the barge as a mere receiving or storing vessel; and he made the nature and conditions of the Defendant's liability depend in some degree upon the answer to that question.

As the verdict of the jury was general, we must deal with the Appellants' exceptions upon the assumption that the jury *may* have found that Mellen hired the barge to the 1st day of October, without any condition or restriction as to the use to which she might be devoted, and that he therefore had a right to employ her, or permit others to employ her, in a suitable and proper manner, in any business for which like barges are usually employed; or, at least, that he had a right to employ her in the same manner as he had employed another barge which had been burned.

In reference to this the jury were instructed: "If the latter was the contract, then the Defendants are not responsible in this action, unless the property has been lost or injured through the want of proper care on the part of the Defendants."

This was clearly upon the principle afterward stated in another

connection. "A bailee is not responsible for loss, unless it happens through negligence or want of care."

The charge further imported that if (being unrestricted as to the use) the sinking of the barge was without the fault of either Mellen or the Appellants, and she was in such condition at the time when she was demanded that she could not be delivered by the Appellants, without any fault or negligence on their part, the Appellants are not liable.

These terms are not, it is true, explicitly stated, but the converse is more than once propounded to the jury, as a test of liability.

And the proposition I have thus stated is unquestionably correct. The hirer of a ship from a lessee for a proper purpose is not bound to restore her on demand, if she be lost without his fault or neglect, while in his lawful possession.

The Judge further charged that, even though the barge was let to Mellen for a special restricted use, and the Defendant Mellen, when he let the barge to the Appellants for the transportation of iron, violated the terms of his lease, still, if that was not known to the Appellants, and they supposed Mellen had a right to lease it in the manner he did, such hiring and taking possession under it would not of itself alone render the Appellants liable for the conversion of the barge. But if loss accrued through *their fault*, or if through *their negligence* they were not in a condition to deliver, and under such circumstances upon demand refused or omitted to deliver, they (the railroad company) were liable.

The result of their instructions was—if the use was not restricted by the contract, neither Defendant is liable, unless the loss was through the want of proper care on the part of the Defendants. If the use was restricted, the Appellants, if ignorant thereof, are not liable, unless the loss accrued through their fault or negligence.

And if, when demand was made of the railroad company, the barge was sunk in such condition that she could not be delivered, but without any fault or negligence of theirs, they are not liable.

Of these instructions the Appellants make no complaint. But

the Judge " further charged, that if the loss occurred in conse-quence of negligence of either the railroad company or Mellen, and there was a refusal to deliver after demand made of both parties, subsequent to the expiration of the bailment, the rail-road company were responsible."

I am not able to reconcile this instruction with the principles governing the charge in its other parts, nor with the rules which determine the liability of the railroad company under a state of facts which the jury may have found, and which were distinctly left to them upon conflicting evidence.

Thus, the jury were, by the submission, left at liberty to find, and we cannot say that they did not find, that the barge was let to Mellen without any restriction or condition restraining him or the railroad company from employing her for the transportation of iron.

They were told that, in such case, the Defendants were not responsible, unless she was lost through the want of proper care on the part of the Defendants.

They were left at liberty to find, and may have found, that " the loss occurred in consequence of negligence of Mellen" solely.

And yet, though all this was found, they are told that the rail-road company is responsible, notwithstanding, provided " there was a refusal to deliver after demand made of both parties, sub-sequent to the expiration of the bailment."

This last instruction cannot be sustained, unless one of two propositions is sound, viz.: unless the railroad company is re-sponsible for Mellen's negligence, or unless the railroad company was bound to deliver on demand made of them after the expira-tion of the bailment, although the barge was, without fault, sunken in the river, so that she could not then be delivered.

Neither of which propositions is sound, and neither of which is consistent with the general principles of the charge.

I think this last instruction was calculated to mislead the jury; although, if I were to pass upon this case, and determine the facts upon the preponderance of the evidence, I might conclude that it was reservedly clear that the use of the barge was restrict-

ed, and not less probable that the Appellants were guilty of neg-
ligence, both of which are lawfully assumed in the argument for
the Respondents. That is not our province. These questions
were left to the jury, and we cannot say that the instruction in
question was immaterial, or could not have affected the ver-
dict.

If the use of the barge was restricted, and she was put to a
use not warranted by the terms of the letting, and by reason
thereof she was lost, then Mellen was liable in damages for her
value, whether he or the railroad company were negligent or
not.

And in such case, in my opinion, the railroad company is also
liable for the value, independent of any question of negligence,
for if by loading the barge with iron they sunk her, they cannot
excuse themselves; for they had no authority from any one com-
petent to give it for putting the barge to such a use. If not
technically trespassers, they had taken the Plaintiffs' vessel, and
in using it for a purpose to which the owners had given no con-
sent, had lost it. As to them it is not material, under our present
system of pleading, whether their act be deemed " conversion,"
or an unauthorized use of and injury to the Plaintiffs' property
(Anderson *v.* Nicholas, 5 Bosw. 121, and cases cited, to the effect
that one who deals with the property of another—the same not
being negotiable paper—must see to it that he acts by authority
of one who has title, or who has an authority to confer, sufficient
to warrant such dealing; p. 130; affirmed 28 N. Y. 600).

At all events, on demand they could not in such case excuse an
omission to return the barge, by showing that in using her for a
purpose to which the Plaintiffs had never consented they had sunk
her (cases cited in Sarjeant *v.* Blunt, 16 J. R. 74; Murray *v.*
Burling, 10 J. R. 172; Campbell *v.* Stakes, 2 Wend. 137; Fish
*v.* Ferris, 5 Duer, 49; Ely *v.* Ehle, 3 N. Y. 506; Rotch *v.* Hawes,
12 Pick. 136; Read *v.* Spaulding, 5 Bosw. 395; 30 N. Y. 630).

On the other hand, if the use of the barge for the transporta-
tion of the iron was permitted by the terms or legal effect of the
Plaintiffs' letting, then the Defendants were neither of them

responsible for her loss, unless that loss occurred in consequence of some negligence or want of care in the keeping or use of the barge (Story on Bailment, §§ 397, 400).

Mellen would clearly be liable to the Plaintiffs, if the loss so occurred, whether the negligence were his own, or his agents', servants', or lessees'.

But in such case the railroad company would not be liable for Mellen's negligence, if themselves entirely free from fault.

It is insisted that the jury should have been instructed to deduct from the value of the vessel when sunk her value in her sunken condition, and therefore the direction to find her value when she was lost was erroneous.

The case appears to have been tried upon a mutual assumption that the barge was a total loss.

No request or suggestion was made to the Judge, that the Defendants claimed any abatement on the ground that she was of value in such sunken condition ; and although the fact did appear that the iron was afterward taken out, and the vessel raised, no proof was given showing the expense thereof, or the expense of repairing her, if repairs were possible.

It is nevertheless proper to say, if, upon the principles above stated, either Defendant was liable, then on demand such Defendant should have returned the vessel, if he desired to abate any supposed then value from the damages to which he was liable; and if, because without fault, the railroad company was not liable, Mellen was still bound to return the vessel, if demanded, and such return was possible ; and her then value furnished no reason for such abatement, if he omitted to do so.

In this aspect of the question of liability I see no ground for the claim that the pleadings will not warrant a recovery for the full value, whether the liability be as in trover, or in a special action in the case for damages.

All the facts are set forth in the complaint, and they warrant a recovery for the full value.

But it is claimed that evidence of what the Plaintiffs paid for the barge, five years before the letting in question, and six years

before the trial, should have been received, when offered by the Defendants, on the question of value when lost.

Whether the price paid for a chattel, or the price at which it is sold, be admissible in evidence, depends upon the special cir-cumstances of each case.

Thus, when a horse is sold with warrantee that he is sound, and an action is brought for a breach of warrantee, it is said by Cowen, J., in Cary *v.* Gruman (4 Hill, 625), that the *price agreed* upon by the parties at the time of the sale is strong evidence of the then value of the horse, if sound ; and the cases he cites not only show this, but also that evidence that the purchaser was subse-quently offered a much larger sum, is also some evidence that he was, if sound, worth much more than the price paid.

So in Campbell *v.* Woodworth (20 N. Y. 499), it was held that a sale at auction is some evidence of the value of goods at the time of the sale, on the ground that it is an ordinary mode of dispos-ing of goods in the market, and a means of testing the market value. So that if fairly conducted, and in such manner as to in-vite competition, it is just to regard it as some evidence of such value.

But this is far short of holding that the price paid for a barge, or other chattel, six years before the time at which the present value is to be estimated, is any evidence of such then present value.

If in any case it could be received, it is here altogether too remote. The testimony in ordinary cases as to market value is confined to the time when the value is to be taken ; or, in special circumstances, to a reasonable time before or after the day in question (Dana *v.* Fiedler, 12 N. Y. R. 40).

There was no error in rejecting evidence of the value of the iron lost. The authorities referred to in support of such evi-dence refer to cases of gratuitous bailment or mandate, where, if the bailee take the same care of the bailment as he does of his own property of like value, and similarly situated, he is held exonera-ted. Here the Defendants were bound to so much care, at least, as men of ordinary prudence usually employ in the care of their property.

Nor was it error to refuse to strike out the evidence of the Plaintiffs' ownership, because the bill of sale to them was not produced. The possession by the Plaintiffs, and the evidence of hiring and use under the contract of hiring, were all that it was necessary for the Plaintiffs to prove; that was presumptive evidence of ownership, and entitled the Plaintiffs to recover its value, if they charged the Defendants with responsibility. There was therefore no necessity for producing the written transfer of the barge to them.

In the case of Dunn *v.* Hewitt (2 Denio, 637), the property in question was taken, not from the possession of the Plaintiffs, but from the possession of the Defendant in the execution, the former owner; the Plaintiffs were compelled, therefore, to make title from him or fail; and they attempted to do so by proof of a sale on execution to one Marshall, and a purchase by Plaintiffs from him.

To prove title by such purchase, the Court held the bill of sale the best evidence.

But for what I deem the error in the charge, the judgment should be reversed, and a new trial granted.

All concur.

Reversed.

<div style="text-align:right">

JOEL TIFFANY,
State Reporter.