## HITNER et al. v. DIAMOND STATE STEEL CO.

(Circuit Court, D. Delaware. October 12, 1911.)

### No. 260.

1. SALES (§ 90*)—CONTRACT—ORDER.

Where a valid oral agreement for the sale and delivery of merchandise contemplated delivery on written orders, and orders not only consistent with but confirmatory of the agreement were received from the buyer, such orders in no way took the place of the agreement.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 253; Dec. Dig. § 90.*]

2. SALES (§ 89*)—CONTRACT—CHANGE.

Where an oral contract for the sale and delivery of iron on written order was fully executed by the buyer by making the order and by full payment of the purchase price, his subsequent letter demanding conditions inconsistent with those agreed upon did not change the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259; Dec. Dig. § 89.*]

3. SALES (§ 391*)—RIGHTS OF BUYER—RECOVERY OF PRICE PAID.

Where goods are sold for delivery on written orders and subject to inspection before shipment, and the purchase price is paid in advance, and the only variance between the goods ordered and those delivered is in size, the buyer cannot, in the absence of a stipulation covering such imperfections, recover back the purchase price paid, although, because of the inconvenience and through no fault of the seller, he has not exercised his right of inspection.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1110–1127; Dec. Dig. § 391.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Action by Henry A. Hitner and another against the Diamond State Steel Company. To report of special master denying its petition for an order requiring the receivers of defendant company to pay it certain damages, the Allegheny Forging Company excepts. Report approved and confirmed, and petition dismissed.

See, also, 176 Fed. 384.

Benjamin Nields, of Wilmington, Del., for petitioner.

Andrew C. Gray, of Wilmington, Del., for receivers of defendant company.

BRADFORD, District Judge. Otto Refior in and by his trade-name of Allegheny Forging Company has excepted to the report of a special master denying his petition for an order requiring the receivers of The Diamond State Steel Company to pay to him certain moneys by way of damages for alleged breach of a contract between them and him. In his petition Refior who is engaged in the business of manufacturing rivets and buying and selling iron and steel products in Pittsburgh, Pennsylvania, alleged in substance that in December, 1905, he placed with the receivers certain written orders for nut iron, hexagon tapped nuts and track spikes; that he made payment in full to the receivers for such iron, nuts and spikes before they were delivered or shipped to him; that the iron, nuts and spikes shipped by the receivers in consequence of such written orders were in large part not of the kind and quality ordered to be shipped but defective and unsuitable for the purpose for which the orders had been given and of little or no value to the petitioner; that he had notified the receivers that he held such iron, nuts and spikes subject to their order and had made demand on them to refund to him the purchase moneys paid by him in advance as above stated, but they had refused so to do. It appears from the evidence that Refior wrote December 13, 1905, a letter addressed to The Diamond State Steel Company in which he said that he could use a certain quantity of nut iron described in the letter, and asking the lowest price for the same, and also desired information as to "the condition of the iron, and whether same is in coils or straight bars, and if in straight bars, the length." This communication, while stating a desire on Refior's part to obtain nut iron as described and asking for its condition and price, was not in any sense an offer nor could it of itself either constitute a contract or serve as the basis of a contract between the receivers and him. It further appears that there were negotiations between Refior and the receivers December 15, 1905, which resulted in an oral contract, agreement or understanding touching the subject matter of this controversy. The receiver Winchester testified to the effect that on or about that day there was a conversation in the main office of The Diamond State Steel Company in Wilmington, Delaware, between Refior and the receivers relating to the purchase of material which the receivers had for sale; that Refior wanted to buy some nut iron and "there was some question as to the manner of payment"; that he, Refior, proposed "that we draw on him, draw drafts with bills of

lading attached," which the receivers refused to do, "feeling that he was here and he had better look at the stuff and pay for it"; that "we didn't want the cars to get to Pittsburgh and be at the mercy of the buyer, whom we didn't know anything more about than Mr. Refior"; that the receivers "agreed to sell him this iron that was down there, he to be satisfied with the stuff and pay for it before it left the yards of The Diamond State Steel Company"; that Refior could look at the material and "see it before it went on the cars, and have his man look at it, but we were not to have any afterclaps, or anything to do with the stuff, after it got to Pittsburgh, and it was to be fully paid for before it left the yards"; that the understanding was that Refior after the material had left the yards of the steel company "could not say it was not up to standard, or was not what he had bought"; that when the material "was loaded, or in process of loading on the car, or before it was put on the car, he could see and satisfy himself that this stuff was satisfactory to him, according to his ideas as to what it should be"; and that Refior agreed that all the material "he might buy from us was to be paid for before it left the yards." The receiver Wallace testified to the effect that at the above mentioned interview Refior told him that "he had been through the works and had seen several lots of material that he might use if we could agree upon a price"; that the witness told Refior "that the only way in which we could or would sell the material was to sell it at a price to be paid for before it was shipped, and that we could not run the risk of there being any condemnation, or any claims made for shipment, by reason of the conditions under which we acted in selling the material"; that witness told Refior "that he could make any inspection, or have any one superintend the weighing or shipping of the material that he desired, but that the one thing that we must insist upon was that when it passed away from Wilmington and was paid for we could entertain no claims of any character"; that Refior wanted "to buy it subject to his paying for it cash against bill of lading, or sight draft against bill of lading and shipping receipt, but that we declined to do"; that Refior "in the beginning, did want to buy it upon different terms and conditions, but we sold it at a price below the market, and as he finally bought the material he evidently considered that in connection with the purchase price"; that the receivers sold the material to Refior below the market price for standard material of that character "simply because we had a certain quantity of certain sizes that might not be exactly what a consumer might need for his purpose, and he might be compelled to use some of it at a disadvantage"; that at that time the material "was sold at the price agreed upon, to be paid for before we shipped the material, and he had the privilege, if he desired to exercise it, of having any inspection of the material, or its weighing, made before shipment, but after shipment we were not to be called upon to entertain any claims of any character"; that "the terms and conditions that I have stated covered all material that we sold to him, and we stated distinctly that it would cover anything else that he might buy from us"; that "the

purchase and sale of the material was definitely agreed upon at the interview that I have referred to, verbally"; that the material then sold to Refior was "the larger portion of the nut iron which he bought, and the understanding   *   *   *   was arrived at then, that he could add to that if he desired to"; that in accordance with that understanding Refior did add to his order and did thereafter buy from the receivers material under the terms and conditions above mentioned.  The witness Todd testified to the effect that at the above-mentioned interview Refior "inquired of Mr. Wallace as to the purchase of this material, and Mr. Wallace distinctly told him that it was to be sold for cash at Wilmington, free on cars here, subject to his inspection at the works here, if he so desired"; that "subsequently the orders came to us for the materials which he had purchased"; and that it was agreed that "the material which he purchased was to be subject to his inspection at Wilmington, if he so desired; otherwise, we would load and ship it as he directed, and there were to be no deductions or claims for shortages of any character after the goods left Wilmington" or on account of "imperfect goods."  Refior in his testimony gives a different version of what occurred at the interview of December 15, 1905; but in so far as his statements vary on material points from those of Winchester, Wallace and Todd, a decided preponderance of the evidence is against him.  It appears that after the above mentioned interview a number of written orders were placed with the receivers by Refior in and by the name of Allegheny Forging Company for material including nut iron, hexagon tapped nuts and track spikes, and in his behalf it is contended that whatever contract or contracts existed between him and the receivers wholly grew out of and rested upon, not the oral negotiations of December 15, but such written orders in connection with the correspondence between the parties affecting or touching the same.  Particular stress, by way of illustration, was laid upon the order of December 16, and the letter of December 19, 1905.  That order was for 34 tons of cold punched nut iron, mentioning, among other things, sizes, price and mode of delivery.  In the letter, written before delivery or shipment of the iron, it was stated:

"Regarding the thirty-four (34) Tons of C. P. Nut Iron, would state that this must be good quality of cold rolled material, otherwise we could not use it.  We advise you of this so as not to put you to any expense should the iron reach here and not be satisfactory."

[1] It is argued that the order must be read in the light of the letter and that the two measured and determined the contractual rights of the parties; and that no other conclusion can be reached without defeating their intention and violating the rule forbidding the varying or contradiction of written contracts by proof of oral agreements inconsistent therewith.  This position I deem unsound.  There is a vital distinction between an independent accepted written order which of itself constitutes the contract between the parties and fully measures their contractual rights and liabilities and a written order given merely for the purpose and in the course of part performance of a valid oral contract between the parties.  And where a valid oral agreement for

the sale and delivery of merchandise contemplates its delivery on written orders, and orders for the same are received, it is not to be assumed that such orders are substituted for the contract in whole or in part, unless the orders are inconsistent with the contract and are accepted by the party to whom given. The order of December 16, 1905, does not purport to abrogate or in any manner impair the oral contract of the preceding day. On the contrary it is therein stated:

"This confirms verbal order of yesterday and the 6 Tons 1x⅝ in addition."

[2, 3] The "verbal order of yesterday" was part and parcel of the oral contract between the parties in which the receivers agreed that Refior should have the right fully to inspect all material ordered by him before it was removed from the premises of the steel company, and Refior agreed to pay cash for the same before shipment and not to make claim after shipment against the receivers for any defects or insufficiencies in such material. The written order was subject to the stipulations and conditions of the oral contract. The order on its face in other respects indicates that it was given in the course of carrying into execution the oral contract. Not only does it contain the statement that the price should be 1½¢ per pound "less 1% for cash," but shows that it was accompanied by a check for $1,009.80, being the price ascertained by deducting 1% from the gross amount representing the 34 tons at 1½¢ per pound. Had the order not been given in conformity to and pursuance of the pre-existing oral contract it would be difficult if not impossible to account for the facts that Refior without any meeting of minds should have assumed that there would be a deduction of 1% for cash and have forthwith sent a check for the amount computed on that assumption. The only reasonable conclusion at this point is that the $1,009.80 was paid by Refior for iron ordered by him pursuant to the oral agreement and to be delivered to him, not only under the written order, but subject to the stipulations and conditions of that agreement. That oral agreement in connection with the written order and the payment in full of the purchase price constituting a valid contract fully executed on the part of Refior for the delivery to him of the iron under and subject to the stipulations and conditions of such agreement, no subsequent requirement or demand by him contained in his above quoted letter of December 19, 1905, or in any other letter, inconsistent with such stipulations or conditions and not assented to by the receivers, could in any respect change or impair the contract between the parties. Similar considerations are applicable to the other orders for iron, disclosed in the pleadings and evidence, given by Refior to the receivers, it appearing that in each case he made a cash payment of the purchase price. A clear preponderance of the evidence establishes the proposition that these various orders for iron were in subordination to the stipulations and conditions of the original oral contract which, while securing to Refior a right before shipment to fully inspect all material ordered, debarred him thereafter from making claim for defects or insufficiencies. The fact that he did not avail himself of his right of inspection certainly is not attributable to any fault on the

part of the receivers. A thorough inspection before shipment might and probably would have involved considerable inconvenience owing to the manner in which the material was packed. But this element of inconvenience could not relieve Refior from the obligations of the contract he had entered into. It is undoubtedly true as a general rule that if one orders of receivers certain goods and pays the purchase price before delivery and the receivers fail to deliver the goods ordered, but furnish other and different goods, the amount of the purchase price paid may be recovered. And this may be done, not on the ground of warranty, but because what was ordered has not been delivered and he who made such payment is entitled in equity and good conscience to be reimbursed. But the facts disclosed in this case exclude the application of the rule; for evidently it cannot apply where there is substantial identity between the goods ordered and those delivered and the variance consists in mere defects or insufficiencies in size, whatever might be the right to rescind or to recover for breach of warranty, if there be one, in the absence of a stipulation covering such imperfections.

On the whole I think that the conclusion reached by the special master is sound and fully justified by the evidence. It is unnecessary to discuss in detail the several exceptions to his report. If he erred at all it was harmless error. The report must, therefore, be approved and confirmed and the petition dismissed, with costs. Let the proper order or decree be prepared and submitted.