## ASSOCIATED METALS & MINERALS CORPORATION v. SWEDISH AMERICA MEXICO LINE, Ltd.

District Court, S. D. New York.

Nov. 4, 1942.

---

Paskus, Gordon & Hyman, of New York City (Joseph C. Slaughter, of New York City, of counsel), for plaintiff.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Roger Siddall, of New York City, of counsel), for defendant.

CAFFEY, District Judge.

Due to the shifting of numbers and letters on the exhibits at various stages of the case there may be difficulty at times in certainly identifying which are referred to. I shall use the numbers and letters with which the exhibits were marked by the clerk as they were introduced in evidence at the trial,—though occasionally I shall furnish also numbers or letters previously put on the papers.

In 1930 fifteen ocean carriers formed an association called the North Atlantic Baltic Freight Conference (hereinafter referred to as the conference). What it consisted of and what were its functions are set out in a written agreement (trial exhibit A; bill of particulars exhibit C; Freese deposition exhibit 1). It dealt with transportation, and especially with rates of freight, from North Atlantic ports of the United States and Canada to ports in Sweden and other European countries within the Baltic area. It prescribed certain regulations governing the conference, as well as its members. It is unnecessary, however, to set out details with respect to its contents.

The conference is still in existence. The defendant was one of the original members who participated in organizing it and has ever since continued to be a member.

In 1937 the number of shipping lines belonging to the conference had grown to eighteen. By then also, and perhaps considerably earlier, the conference carriers had adopted a form for shipping agreements between themselves and the merchants (commonly spoken of as contract shippers) who employed the facilities of the carriers.

Two contracts of the type described were entered into by the conference carriers (including the defendant) with the plaintiff during December, 1937. One was dated the 7th day (trial exhibit 3) and the other, the 29th day (trial exhibit B; bill

of particulars exhibit A) of that month. Every contract-shipper contract was signed by an individual merchant. It was also signed by the conference as agent for all carriers included in the conference. It left the merchant free to ship by any conference member of his own choice who, when called on, had space available.

Because both December, 1937, shipper contracts with the plaintiff were identical, except for the names of particular commodities and the rates of freight thereon inserted in one of the blanks in the forms (which were printed), there is no need for setting out more than one of the agreements. As the parties in argument on this aspect of the case referred chiefly to the December 29 agreement (trial exhibit B) with respect to details I shall confine myself to that and shall hereinafter call it the shipping contract.

There are several features of the shipping contract which should be carefully noted. The first is that the contract with which we are now concerned was made by the conference, in behalf of all its members, with the plaintiff alone. Another is that the contract related wholly to export shipments of the commodities therein mentioned from specified North Atlantic ports, on this side of the ocean, to Scandinavian and Baltic ports. A third thing is that it provided for discharge of cargo at one of the latter ports, served by the carriers, as might be designated by the merchant who, upon signing the instrument, became a contract shipper. Among the ports of departure at which it was stipulated that articles to be transported should be tendered to carriers for their vessels was Montreal.

While the shipping contract (trial exhibit B), just described, was in full force, on August 14, 1939, by telephone the plaintiff and the defendant reached terms, confirmed by a letter of that day from the defendant to the plaintiff (trial exhibit 1; complaint exhibit A; Freese deposition exhibit 4), for the booking by the plaintiff with the defendant of a shipment of 1,000 tons of pig iron from Cleveland, Ohio, to a Swedish port to be designated later by the plaintiff. The destination ports among which the plaintiff could select were six in number and were of two kinds. The evidence shows that in the language of the trade four of them were what are called base ports and two of them were what are called out ports. The shipper was required, in advance of loading, to specify the discharging port.

In the booking letter the freight on a through basis to a base port was specified to be $5.50 and to an out port as $6 per ton. It was further specified that the pig iron was to be loaded into a lake vessel at Cleveland on October 12 or 13 in order to connect with the defendant's vessel Svaneholm, scheduled to sail from Montreal on October 19. The August 14 agreement is hereinafter referred to as the booking.

Twenty days after the booking and more than five weeks previous to the date set for the plaintiff to present the cargo to the defendant at Cleveland, on September 3, 1939, war broke out. This was between Germany on the one hand and Great Britain, Northern Ireland, France and Poland on the other. Four days later, on September 7, 1939, in behalf and at the instance of the carriers, the conference gave notice (trial exhibit C; Freese deposition exhibit 3) to the plaintiff that, because of the war, the agreements with the plaintiff then "in effect covering shipments" to Scandinavian and Baltic ports (which notice by its terms apparently included the shipping contracts dated December 7 and 29, 1937, trial exhibits 3 and B, and the booking dated August 14, 1939, trial exhibit 1, complaint exhibit A) were terminated. Eight days after war began,—and a month before the date fixed for the cargo to be turned over to the defendant at Cleveland,—on September 11, 1939, direct notice to the plaintiff (trial exhibit 2; complaint exhibit B) of the cancellation of the August 14, 1939, booking (trial exhibit 1; complaint exhibit A) was given by the defendant individually. Thereafter the defendant refused to transport the pig iron.

As stated above, it was originally contemplated that the cargo would pass into the hands of the defendant at Cleveland. The program was that it would move from Cleveland to Montreal and from there, on the defendant's ship Svaneholm, to the Swedish port of destination. After the cancellation notices had been given there were negotiations between the plaintiff and the defendant for shipment from Cleveland to New York and from New York to a Swedish port (trial exhibits D to G). These, however, came to nothing. In November, 1939, the pig iron was shipped via a different carrier at the freight rate of $14 per ton.

The present action seeks to recover $8 per ton. This is the excess of the $14 per ton actually paid by the plaintiff for trans-

portation on the line of another carrier over the $6 rate stipulated in the booking (trial exhibit 1). In other words, the total transportation expense to the plaintiff was $8,000 greater than it would have been at the original agreed-on rate. The present action is to recover this sum, with interest.

The facts are without substantial dispute. On the uncontroverted evidence there arise merely questions of law. Six have been discussed by counsel. These are as follows:

(1) Did the shipping contract (trial exhibit B) apply to pig iron?

(2) Did a so-called war clause (paragraph 9) in that contract confer on the conference, in behalf of the defendant as well as of other conference members, or confer on the defendant, power to end the contract, on the ground that war was in progress, or was the authority to cancel on the ground of war limited to refusal to make future commitments?

(3) If, by reason of the war clause, the defendant had the right to terminate the shipping contract, did the exercise of that right release the defendant from liability under the booking?

(4) Was the shipping contract inapplicable to the shipment mentioned in the booking because transportation of the goods, as provided for, was partly extra-territorial?

(5) Was the cancellation in bad faith?

(6) If the cause of action sued on be established, what amount is the plaintiff entitled to recover?

A good deal of the evidence has no bearing on these questions and must be disregarded. However, before attempting to answer them some further explanatory comment may be helpful.

In the branch of the shipping business involved here, at the time of the transactions dealt with there were, and I understand there still are, two types of ports in Sweden and other European countries. As heretofore remarked, one set are called base ports; the others are called out ports.

Base ports are major ports and are direct ports of call for vessels going from this side of the Atlantic. An example of such ports in Sweden is Gothenburg. Out ports are ports to which cargo is delivered usually by means of transshipment from base ports, although there are instances in which, if the cargo be of sufficient quantity to warrant and the water be of sufficient depth, some-times the ships after crossing the Atlantic continue to the out ports; thus avoiding transshipment. An illustration of an out port in Sweden is Otterbacken, which is near Stockholm.

To determine the freight rate to an out port an arbitrary is combined with the rate for carriage to the base port. A list of arbitraries on pig iron as well as on sundry other commodities is given in a tariff sheet (trial exhibit J). As appears in the sheet, the arbitrary on pig iron to Otterbacken is $1 per ton. If, therefore, the base port were Gothenburg, in order to get the total freight charge on pig iron to Otterbacken, $1 per ton would be added to the rate to Gothenburg.

Save for the purpose of understanding the evidence, there is no need to give further attention to the differences in types of ports in Sweden. This is so especially because the parties have agreed on the applicable rates which must be taken into account in fixing the amount of damages in event it be shown that the plaintiff is entitled to recover.

Likewise in the branch of business in which the conference is interested there are contract rates and tariff rates. The latter are illustrated for pig iron in exhibits H and I. Contract rates are those enjoyed by merchants who have shipping contracts of the type of exhibit B and are lower than tariff rates.

Aside from contract rates being lower, the shipping contract embodies other advantages to a contract shipper. Among such advantages two are pertinent to an accurate comprehension of a booking. These are as follows: (a) A contract shipper has the option to select for his use any of the vessels operated by conference members, provided only that he agree with the particular carrier as to the quantity of the shipment (paragraph 3). (b) The carrier selected is obligated to accept the shipment, provided only that "suitable unbooked space is available" when the merchant applies for the booking (paragraph 4). A third advantage, though not bearing directly on the booking, is that for commodities other than those taking the $9.50 rate the contract shipper shall get the lowest rate "then in effect for the particular commodity" shipped (paragraph 5).

Nevertheless, as in the case of different kinds of ports, so as to contract and non-contract rates we need not be further concerned. This is true because there is no

dispute between the parties as to what are the rates or what is the amount of damages in event it be established that the plaintiff is entitled to recover.

With respect to each of the questions for debate, counsel squarely disagree. Both sides have advanced their arguments with apparent perfect confidence. After review of all phases of the matter, however, I am impressed that there is room for difference of opinion. Yet I have concluded where, in my judgment, the weight of argument lies on each issue raised and shall make my statement accordingly.

With the preliminary explanations completed, I shall now take up in order the six questions heretofore set out as covering all the issues raised by the parties.

I. The shipping contract (trial exhibit B, paragraph 5) describes the commodities to which it applies. It also fixes or provides for fixing the freight rates on those commodities.

Paragraph 1 bound the plaintiff (called the merchant) to seek use of the facilities of the conference carriers for all eastbound transportation of its "commodities mentioned" in the contract from North Atlantic to Scandinavian and Baltic ports. The plaintiff thus became obligated exclusively to patronize the conference carriers in the respects and on the terms prescribed in the contract.

Paragraph 2 says that the contract covers "all export shipments" by the merchant (that is, by the plaintiff) to Scandinavian and Baltic ports served by the carriers and designated by the merchant. It then says that such shipments include "the herein named (or provided for) commodities." It will be noted, therefore, that, without in words expressly describing them, almost at the inception of the instrument it is definitely declared that the contract covers two classes of commodities. One class is "named"; the other is "provided for." So also for one class a rate is "named," whereas as to the other it is "provided for."

In consequence, paragraph 2 gives warning that when the definition of the commodities is reached, as it is reached in paragraph 5, one class will be "named" and the other class will not be "named," but will be "provided for." This is precisely what we shall find has been done in paragraph 5.

Again, in paragraph 4 (in complete harmony with paragraph 2) it is repeated that the applicable rates will be "named or provided for herein." Accordingly we are told that, in addition to there being two classes of commodities, there will or may be different rates; one "named" and the other "provided for."

In paragraph 5 the two separate classes of commodities and the rates thereon to which the agreement applies, as I view them, are plainly set out.

The classes are stated to be as follows: (a) "Scrap Metals, nickel bearing for remelting or refining purposes" (with certain specified exceptions, which for the moment will be disregarded) and (b) "Other commodities as may be shipped by the merchant from time to time, which shall be deemed covered by this agreement, at the lowest rates then in effect for the particular commodity."

A single rate for the first class in its entirety is "named." Rates for the second class are not named; they are "provided for." As will be seen, there are several provided-for rates, some of which can be ascertained only by computation.

The rate for every article in the first class is $9.50 per ton. That is perfectly definite. On the other hand, before we can arrive at what is the rate applicable to a particular article within the second class, all the provisions bearing on it must be scrutinized. Of necessity this results from the fact that the agreement is that rates applicable to the second class of commodities will be "provided for." It is only out of the relevant provisions that the exact rate on any particular article belonging to the second class can be certainly determined.

In the first place, as already pointed out, the document says that the second class of articles shall take, respectively, "the lowest rates" in effect at the time of shipment "for the particular commodity." In the second place, it is said that "the rates in this agreement" (meaning, possibly, the rates for both classes or, possibly, only the rates of the second class, and it is immaterial which) "apply on shipments destined" to twelve ports (which we know from the evidence to be base ports), including Gothenburg. In the third place, it is said that "the minimum charge" on a single bill of lading to "these ports" will be $5 and "to other ports" (that is, to base ports other than the twelve named and to out ports) will be $7.50. In the fourth place, it is required that on shipments "destined to ports within the scope of this agreement which ports are not specifically mentioned herein"

(meaning, as I take it, to base ports outside the twelve named and to all out ports, of which out ports Otterbacken is an illustration) the arbitrary charges of the carriers (which are scheduled in exhibit J) "shall be added."

In other words, if I be correct in my reading of paragraph 5, the rate on all articles of the first class is $9.50 per ton, while the rates on articles of the second class (including the parenthetical enumeration of scrap metals *not* belonging to the first class), though they vary, are very substantially less than the rate on articles of the first class.

Again, in framing the definition of "other commodities" in paragraph 5 there are injected the words "which shall be deemed covered by this agreement." As it seems to me, an interpretation would be strange indeed which did not attribute to those words the significance that "other commodities" means commodities of all kinds other than "Scrap Metals, nickel bearing for remelting or refining purposes" and bring within the second class the articles expressly excluded from the first class and there, preceded by the word NOT, carried in parentheses, so that such articles excepted from the $9.50 rate should have the advantage of the lower rates provided for articles of the second class.

If the interpretation which I have suggested would be strange were it not rejected, I think that by its acceptance inharmony would be imported into the instrument without justification.

■ The sole basis assigned by the plaintiff for its contention that the words "other commodities" do not embrace pig iron is, as urged, that under the doctrine of ejusdem generis pig iron is not of the same general kind or nature as the preceding mentioned nickel bearing scrap metals. It seems to me clear, however, that this doctrine is inapplicable here. I say this for the reason (among other things) that, as I construe the document, in paragraph 1 the plaintiff unequivocally committed itself "to offer or cause to be offered" to the steamship lines, consisting of the members of the conference, for transportation by them "all shipments of the commodities" mentioned in the agreement and obligated itself (paragraph 3) to distribute its shipments equitably among the several carriers. It strikes me that it would be quite incongruous if the provisions mentioned were construed to cover less than commodities of all kinds.

There is an additional consideration of consequence which I believe fortifies the interpretation I advocate. That is this: Unless "other commodities" be taken to mean all commodities outside of those embraced in the first class and taking the $9.50 rate, it would seem to me that the "not" group set out in parentheses in connection with the definition of the first class would be orphaned. The articles in that group would be put out of the first class by the single word "not" and out of the second class by the single word "other." From the very frame work employed, as well as from the exact language used, in paragraph 5 I cannot escape the feeling that the parties contemplated that, by wording of the first and second classes, they were covering all kinds and natures of commodities, without the omission of any commodity whatever.

■ I feel the more strongly that the conclusion I have reached is right because, as I think, it is sustained by the last sentence which Prof. Williston quotes approvingly in his book on Contracts, revised edition, volume 3, section 619, as follows: "general words following an enumeration of particular things may include other things not ejusdem generis, if such appears to have been the intention of the parties."

I think also that State of Alabama v. Montague, 117 U.S. 602, 609-611, 6 S.Ct. 911, 29 L.Ed. 1000, and similar cases cited by the plaintiff, are distinguishable on their own peculiar facts.

It is difficult, if not impossible, to conceive that the business men who joined in the shipping contract would have employed the words "other commodities" to mean something obscure or to mean less than the whole of the commodities shipped by the plaintiff at less than the $9.50 rate. The only natural attitude for the defendant, as I believe, would have been to get all the transoceanic baltic transportation business of the plaintiff it could and the only natural attitude of the plaintiff would have been to get smaller rates for as much of its business as possible.

So firmly am I convinced that these things are true that I think adoption of the construction urged by the plaintiff would defeat the intention alike of both parties.

II. In part, paragraph 9 of the shipping contract (trial exhibit B) reads as follows: "9. In the event of the * * * existence of war, * * * affecting the operations of the Carriers, or any of them in the trade

covered by this agreement, the Carriers or any one or more of them shall at their option have the right to cancel this agreement."

From September 3, 1939, to date war has raged in Europe. The court indisputably knows (Cf. United States v. Hamburg-Amerikanische Co., 239 U.S. 466, 475, 36 S.Ct. 212, 60 L.Ed. 387; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 327, 56 S.Ct. 466, 80 L.Ed. 688) that the war has definitely affected the operations of the defendant's ships over the routes embraced in the shipping contract. Due particularly to modern conditions and to current methods of warfare, the danger of injury by mines or torpedoes or of delay and expense accompanying searches or seizures or even confiscation of cargoes or ships or of increases in the costs of hull or cargo insurance and other additional costs of or incidental to transportation is and from the inception of the conflict has been great, and inescapable, if the ships ply or undertook to ply in the war zone or anywhere within the neighborhood of where contests at sea between the warring nations are or have been in progress.

Moreover, specifically the geographical location of Sweden is such that it is inevitable that ships passing from this side of the Atlantic to a port in Sweden would necessarily be forced to navigate through the scene of active military struggles or encounters. The hazards I have enumerated, therefore, would be unavoidable.

All that has been said would have effect even though the transportation with which we are concerned had occurred between a neutral port in the United States and a neutral port in Sweden. In addition, it may be noted that when they contracted the parties contemplated carriage via Montreal and that war against Germany was declared by Canada on September 10, 1939. In consequence, if there had been literal fulfillment of the plan of carrying the cargo through Montreal, the danger probably would have been substantially enhanced.

■ It follows, obviously as I think, that existence of the war was a complete warrant for terminating the shipping contract. So far as I can see, there is no possible support for the argument that the right of refusal to go on with the contract related only to future commitments. I feel that so to hold would be in flat defiance of the unambiguous provision of paragraph 9. The right there specified is to cancel "this agreement." At the minimum these words confer a right, immediately upon the coming into existence of war, to put an end to the shipping contract in its entirety.

■ III. As I understand, the plaintiff insists that the conference cancellation of the shipping contract left the booking (trial exhibit 1) wholly unaffected. I do not think, however, that this proposition can be maintained.

In the first place, the booking states but a few of the terms of the agreement for transportation of the pig iron. These were the ports between which the voyage was to occur, the freight rates, the date the goods were to go aboard a lake vessel at Cleveland and the date they were to connect with a designated one of defendant's vessels at Montreal. Plainly, as it seems to me, the additional terms governing the transportation of commodities at rates less than $9.50 were of necessity embodied in the agreement for the transportation of the pig iron as fully as if they had been transferred from the shipping contract to the booking.

Furthermore, at least two provisions of the shipping contract so firmly tie that contract to, and indeed into, the booking that the shipping contract cannot fall without the booking falling also. These provisions are as follows: (a) In paragraph 2 of the shipping contract it was agreed that "this contract," meaning the shipping contract, "covers all export shipments" by the plaintiff of the named or provided for commodities from North Atlantic ports to Scandinavian and Baltic ports. (b) In paragraph 5 it was agreed that the commodities of the second class (namely, those shipped at rates less than $9.50) "shall be deemed covered by this agreement",—that is, by the shipping contract.

What was contained in the shipping contract and what was contained in the booking were integral parts of a single arrangement. Indeed, it would not be too much to characterize the booking, which was anticipated by the shipping contract, as mere mechanics for the execution of the contract. Of necessity, therefore, when the shipping contract terminated, probably there remained no contract at all and surely no complete contract for the transportation of the pig iron. As I see it, even if no special notice of cancellation of the booking had been given, the termination of the shipping contract by the notice from the conference would have left the plaintiff without any

contract, longer binding the defendant, to carry the iron to a Swedish port.

At the risk of some repetition, I shall restate in a rather different way the substance of the last point discussed.

As I grasp its contention, specifically the plaintiff argues that, even though the defendant was within its rights, through the conference as its agent, in terminating the shipping contract, yet the defendant thereafter was bound by the booking and cancellation of it was not justified. In other words, the plaintiff would treat the booking as, in and of itself, a complete contract between the parties, precisely as if the shipping contract (trial exhibit B) had never been included in the arrangement for transportation of the pig iron.

■ I think, however, that it is enough to say in response that the two instruments mentioned were parts of one transaction; accordingly that, in order properly to interpret them, the two must be taken together precisely as if they constituted a single document; and, hence, that with the ending of the shipping contract the booking was also at an end, even if no separate notice of its cancellation had ever been given by the defendant. Cf. Hitner v. Diamond State Steel Co., C.C., Del., 197 F. 850, 853-855; Beach v. Raritan & Del. Bay R. R. Co., 37 N.Y. 457, 459–461, 463–465. See, also, 3 Williston on Contracts, revised edition, § 628.

■ IV. The original arrangement was that the initial step in the transportation should be movement of the goods by lake vessel from Cleveland to Montreal and that the second step should be aboard the defendant's ship Svaneholm from Montreal to a Swedish port. On account of the journey on the defendant's vessel being wholly outside of the United States, as I gather, the position of the plaintiff is that the shipping contract (trial exhibit B) must be disregarded because, as is asserted, the contract being extra-territorial in application, the Maritime Commission of the United States was without authority to sanction it. I feel, however, that, if I correctly comprehend the contention, it is without merit.

It will be noted that the defendant does not rely on any action taken by the Maritime Commission (minutes, pp. 95–97). Moreover, the decision cited by the plaintiff (Swayne & Hoyt v. United States, D. C.D.C., 18 F.Supp. 25; affirmed 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659) is clearly distinguishable and does not sustain the view that absence of approval by the Commission would render the contract invalid.

Again, if the contract be void, I feel that there would be grave doubt at least as to whether there is any foundation in law at all for maintaining the present action.

■ V. Lastly, it is insisted that the separate cancellations by the defendant through the conference as its authorized representative and by the defendant itself individually constituted a mere device to get for the defendant an increased freight rate and were not taken in good faith. If, as I think is plain, the coming on and existence of the war increased the expense of the defendant in transporting the pig iron and it might reasonably contend that the existence of war gave a right of cancellation, I fail to see how its effort through cancellation to avoid a prospective loss can properly be denominated bad faith. What is of more consequence, however, is that, if paragraph 9 of the shipping contract (trial exhibit B) actually be applicable and the interpretation I have heretofore adopted be correct, then obviously there is no basis for criticism of either the conference or the defendant for merely availing of a right.

It is suggested that because, at dates in 1939 subsequent to the termination of the shipping arrangement with the plaintiff, the defendant sailed, owned or chartered ships from New York and Montreal to a Baltic port (Freese deposition, p. 24; Theiss deposition, p. 17; minutes, pp. 102–103), the defendant could equally well have transported the plaintiff's pig iron to Sweden. It seems to me, however, that the fact that transportation of the other goods by the defendant after cancellation of the contract with the plaintiff was at a freight rate approximately double that previously prevailing (minutes, pp. 82, 93) deprives the contention of weight. Undoubtedly the expense of transportation was substantially increased with the coming on of the war,— though by how much does not appear and, indeed, during the early days of the war the size of the increase was necessarily uncertain. Manifestly, however, without a corresponding increase in the rate of freight, the defendant would have surely been subjected to some actual loss; and I see no warrant in the evidence for a finding that doubling the rate at the commencement of the war was not justified under the circumstances.

VI. Counsel agree that if plaintiff has a cause of action, then the amount of the principal of the recovery should be $8,000 (minutes, pp. 13, 14, 24, 28). They also agree that if interest thereon be recoverable, it should run from November 15, 1939 (p. 29). In that event, I think the proper rate would be 6%. New York Civil Practice Act, § 480; New York General Business Law, Consol.Laws, c. 20, § 370; Royal Indemnity Co. v. United States, 313 U.S. 289, 293, 296, 297, 61 S.Ct. 995, 85 L.Ed. 1361.

For the reasons given above, however, I think the defendant is entitled to prevail. Hence, I shall file in the Clerk's office findings in conformity with the foregoing and direct judgment for the defendant.