## SWAYNE & HOYT, LIMITED, et al. v. UNITED STATES.
### No. 60850.

District Court of the United States for the District of Columbia.

June 29, 1936.

Elisha Hanson, Eliot C. Lovett, and Frank Lyon, all of Washington, D. C., for plaintiffs.

Leslie C. Garnett, U. S. Atty., H. L. Underwood, Asst. U. S. Atty., and R. H. Hallett, Asst. Counsel, U. S. Shipping Board Bureau, all of Washington, D.C., for defendant.

Before GRONER, J., United States Court of Appeals for the District of Columbia, and WHEAT, C. J., and PROCTOR, J., District Court of the United States for the District of Columbia.

PER CURIAM.

This is an equity suit brought by plaintiffs to set aside an order of the Secretary of Commerce requiring plaintiffs (who compose the Gulf Intercoastal Conference) to cease and desist the practice of entering with shippers into certain rate contracts.

The order complained of restrained plaintiffs from charging two separate rates for the same service: One, the higher, charged against those shippers who refused to sign contracts agreeing to use plaintiffs' facilities exclusively; the other, a lower, charged against those shippers who enter into such contracts. The hearing was by a court constituted in accordance with the provisions of section 47 of title 28 U.S.C.A. (see, also, Act Sept. 7, 1916, c. 451, § 31, 39 Stat. 738 [46 U.S.C.A. § 830]).

Up to 1916 there was—speaking generally—no regulation by Congress of the rate structure and other practices of common carriers engaged in intercoastal transportation. In 1916 Congress passed the Shipping Act (39 Stat. 733, § 14, as amended, 46 U.S.C. § 812 [46 U.S.C.A. § 812]). The act applies somewhat differently to carriers by water engaged in foreign commerce and those engaged in intercoastal commerce. As to the latter, Congress required that schedules of reasonable rates, fares, etc., should be filed with the Shipping Board and observed by the carriers. The act forbade carriers' charging anything in excess of the maximum except with the approval of the Board; forbade rebates, discrimination, or unfair methods against a shipper patronizing another carrier. Section 16 (46 U.S.C.A. § 815) provides that:

"It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

"First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue

or unreasonable prejudice or disadvantage in any respect whatsoever."

In 1933 Congress enlarged the powers of the Shipping Board (47 Stat. 1425, § 2 46 U.S.C. § 844 [46 U.S.C.A. § 844]). The new act required every carrier to file with the Shipping Board and keep open to the public its actual schedule of rates, fares, etc.; and forbade any change in the rates, fares, etc., except by publishing and filing a new schedule not effective, without the approval of the Board, earlier than thirty days after filing; and gave the Board power to suspend the effectiveness of the new schedule pending a hearing. Under the 1916 act, carriers were required to file only their maximum rate. Under the 1933 act, they are required to file their actual rate, and the actual rate so filed may not be changed without giving thirty days' notice.

On June 10, 1933, the President issued an Executive Order numbered 6166, pursuant to the Executive Department Reorganization Act of June 30, 1932 (47 Stat. 413, §§ 401–409), as amended March 3, 1933 (47 Stat. 1517, § 16), whereby he abolished as of August 10, 1933, the United States Shipping Board and transferred its functions to the Department of Commerce. Ever since, the functions of the Shipping Board have been administered by the Department of Commerce under the direction of the Secretary.

In February, 1934, the Secretary instituted an investigation into the practices of intercoastal carriers, including the practice of extending preferential rates to shippers who agreed to use the carrier's facilities exclusively. This original proceeding was designated Docket No. 126. As a result of the hearings, an order was entered July 3, 1935, requiring the Gulf Conference on or before October 3, 1935, to discontinue the use of the contract rate system as embodied in the tariff on file. This order was vacated September 16, 1935, and a new hearing held, known as Docket No. 294. On January 21, 1936, the Department issued its report of the investigation, and the Secretary issued his order requiring the Gulf Conference to cancel the contract rates as contained in its tariff. The findings of the Secretary were:

1. "It is clear that the real purpose of the suspended rates and rule is to prevent shippers from using the lines of other carriers and to discourage all others from attempting to engage in intercoastal transportation from and to the Gulf."

2. "The Department finds the contract rate system provided for in the schedules under suspension not justified by transportation conditions in the trade involved, and unduly and unreasonably preferential and prejudicial in violation of section 16 of the Shipping Act, 1916."

The effective date of the order was continued to June 30, 1936, and it is the purpose of this suit to annul and set it aside, on the grounds that the findings of the Department and the order of the Secretary are contrary to the evidence and contrary to the law applicable to the situation.

The question of the lawfulness of the order, and the further question whether the transfer of the functions and authority of the Shipping Board to the Shipping Board Bureau of the Department of Commerce is legal and valid, are the two questions for decision.

Briefly, the contract rate system works as follows: The Conference selects a number of items as to which it establishes a contract rate. These items are usually those heavy commodities which move regularly in large quantities. Shippers of these commodities may execute a contract and thus avail themselves of the advantages of a lower rate that during the period of the contract may not be increased. The shipper—as his part of the agreement—promises to ship by vessels of the Conference lines all water-borne shipments which he makes from any Gulf Port to the West Coast during the term of the contract. The agreement does not prevent the shipper from transporting by rail to the West Coast or from shipping out of North Atlantic or South Atlantic Ports. It does require him, however, if he ships from the Gulf to the West Coast to use one of the Conference lines, and paragraph 4 of the contract provides that if the shipper violates this agreement, the whole contract shall terminate and the shipper shall be liable for the noncontract rate on all shipments made during the term of the contract. The contracts are executed for a term of six months.

The noncontract rate is the rate fixed for items covered by the contract rate when those items are shipped by a person who has not executed a contract with the Conference. It is 10 cents per hundred pounds or $2 per ton higher than the con-

tract rate, and this figure is arbitrarily fixed. There is no difference in the service offered or rendered to a contract and a noncontract shipper. As explained by the Chairman of the Conference, a noncontract shipper pays 10 cents per hundred pounds for the privilege of holding off to patronize any cut-rate line that may come along. The witnesses for the Conference testified that approximately 64 per cent. of all port-to-port tonnage carried by plaintiffs (westbound) moved under contract rates, and that of this 64 per cent., more than 99 per cent. moved under contracts. The contract rate applies only to westbound port-to-port shipments and does not apply to combination rail or barge shipments.

In justification of the contract system, the plaintiffs point out the disastrous results of rate wars in the past, the stability of rates and service as the result of the system, the insufficiency of traffic from the Gulf to support another line, and the almost universal satisfaction and approval with which all shippers regard the system.

The Department, on the other hand, insists the effect of the system is to create a monopoly in favor of the Conference lines to the exclusion of any other lines which might wish to enter the Gulf intercoastal trade; is also to force shippers to tie themselves up for a period of six months and lose the opportunity of using other lines which might offer cheaper service; and, finally, to require those who do not tie themselves up to pay an unjust and discriminatory rate.

There is much to be said, from a practical standpoint, in favor of the Conference system, for there is no dispute that the Gulf trade has suffered by rate-cutting wars and equally, as we think, no dispute that the system tends to stabilize conditions. The evidence likewise supports the position that the available traffic from Gulf ports will not support another line and that the invasion of the territory by an outsider would necessarily result in rate wars and some demoralization of shipping. In all these respects it commends itself to those immediately concerned. It is not, therefore, surprising that the great bulk of the patrons of the Conference lines express approval of the system. The stability of rates and of service enables them to quote prices for future deliveries, with the assurance that for several months, at least, there will be no increase in freight charges. While saying this much, how-

ever, these shippers realize, as of course is obvious, that the purpose and effect of the contract system is to force traffic to the Gulf Conference lines and to that extent to create a monopoly so far as shipment from Gulf ports is concerned.

Notwithstanding this latter condition, the great majority of shippers, as we have seen, assert the desirability of the system because of reliability of service and reasonableness of rate. To obtain these, they are willing to forgo the opportunities of cheaper rates from an occasional intruder or cheaper rates with demoralization of service incident to a rate war. Plaintiffs assert that there is nothing in the system to prevent other lines, if they desire, from applying for membership in the Conference and enjoying the benefits of the system. But, in spite of this, the fact is that if a shipper wants to hold himself free to get a lower rate from casual nonestablished carriers, he must pay $2 a ton more than the shipper who agrees to use the Conference lines exclusively; and freedom of operation in the Gulf is more theoretical than practical, for if the business offered is only enough to load one vessel each week, as seems to be conceded, it would be business folly for others regularly to enter the field.

Without deciding, therefore, to what extent we are bound by the finding of the Secretary that the practice is discriminatory and violates the provisions of section 16 of the act, we are of opinion that the admitted and undisputed facts bring the practice within the condemnation of the statute. The act makes it unlawful for the carrier to give any undue or unreasonable preference or advantage to any particular person or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. The contract in question unquestionably confers a preference on the shippers who accept it. Through it they obtain a rate of $2 per ton less than the rate charged other shippers for the same commodities for the same service in the same ships. There can be no dispute on that subject. But, admitting this, plaintiffs say that the preference must be undue or unreasonable and point to the language of the statute in support of their position. They insist that the preference to their contract shippers is not unreasonable, is offered to all alike, and is reciprocally beneficial—beneficial to the carrier because it

insures it a constant flow of remunerative business and beneficial to the shipper because it insures him stability of rate and regularity of service. And all of this may be true. But the unreasonableness of the contract is in the fact that it insures to one shipper who is willing to tie himself up by contract the same service at a cheaper rate than the carrier is willing to extend to another shipper who is not, and thus is effective to coerce all shippers to abandon the advantages of competition or pay a penalty. It is likewise subject to condemnation for this reason. The rate charged the contract shippers obviously is, from the carrier's point of view, a remunerative rate. This being true, the exaction of a higher rate by 10 cents per cwt. from all other shippers is an undue and unreasonable exaction. It is in effect a penalty.

Not only is this true, but the contract is likewise prejudicial to the "locality," i. e., the Gulf territory, because the tendency is to exclude all competition and create a monopoly in favor of the Conference carriers. The effect of the monopoly is to destroy the checks and balances imposed by free and unrestrained competition; and we cannot doubt that, in forbidding any water carrier from subjecting any locality to unreasonable prejudice or disadvantage, Congress intended to include any act the tendency of which would be to destroy the restraints which competition imposes.

Here the result of the contract system is a complete, effective, and perpetual bar restraining all other carriers from attempting to serve the public as carriers between Gulf ports and the West Coast. Such an imposed monopoly was unreasonable discrimination at common law. Menacho v. Ward (C.C.) 27 F. 529. It is no less so, under the provisions of the federal statute. In saying this, we are by no means unmindful of the problems of the American shipowner. That these problems are pressing to the point of emergency is obvious to those who have watched the steady decline of American shipping since the period of the World War; and that the problem requires special treatment from Congress is, we believe, universally admitted. The increase and maintenance of the American merchant marine is a subject of national concern, indeed of national safety, but the remedy is political and not judicial.

Second. The transfer of the former functions of the United States Shipping Board by executive order to the Department of Commerce was, in our opinion, in all respects legal and effective to confer on the Secretary all the regulatory powers of the statute. The question is not new. Precisely the same point was urged in Isbrandtsen-Moller Company, Inc., v. United States et al. (D.C.) 14 F.Supp. 407; and the opinion of Judge Chase so fully and, as we think, satisfactorily answers it that nothing more need be said, except to refer to that case and adopt its reasoning, which we do.

In view of what is said above, it follows that the bill in this case should be, and it is dismissed.

Dismissed.