SWAYNE & HOYT, LTD. ET AL. *v.* UNITED STATES.

No. 494.  Argued February 11, 12, 1937.—Decided March 1, 1937.

*Mr. Elisha Hanson,* with whom *Messrs. Eliot C. Lovett* and *Frank Lyon* were on the brief, for appellants.

*Assistant Solicitor General Bell,* with whom *Solicitor General Reed* and *Messrs. Hugh B. Cox, Wendell Berge,* and *R. H. Hallett* were on the brief, for the United States.

MR. JUSTICE STONE delivered the opinion of the Court.

Appellants are steamship corporations engaged in the transportation of freight through the Panama Canal between United States ports on the Gulf of Mexico and on the Pacific Coast. They constitute the Gulf Intercoastal Conference, which operates under an agreement, approved March 28, 1934, by the United States Shipping Board Bureau of the Department of Commerce, as provided by § 15 of the Shipping Act of 1916, 39 Stat. 733, 46 U. S. C. § 814. On May 25, 1933, the Conference, in conformity to the Intercoastal Shipping Act of 1932, § 2, 47 Stat. 1425, 46 U. S. C. § 844, filed with the United States Shipping Board Bureau a new tariff, effective June 2, 1933, publishing certain rates for the transportation of freight, westbound from coast to coast.

The tariff, continuing the contract system in use by the Conference, provided for "contract rates" for specified commodities, to be enjoyed by shippers who agree with the Conference, by written contract, to make all their shipments of those commodities by vessel of the Conference members for a specified period. The tariff rates on the same commodities for shippers not entering into contracts were $2.00 per ton higher than the contract rates. In 1934, the Secretary of Commerce ordered an investigation by the Shipping Board Bureau of the lawfulness of the contract rate system (see § 22 of the Shipping Act, 39 Stat. 736, 46 U. S. C. § 821, and § 3 of the Intercoastal Shipping Act of 1933, 47 Stat. 1426, 46 U. S. C. § 845). The ensuing report condemned the discrimination, and on July 3, 1935, the Secretary ordered the appellants to cease charging the higher rates to shippers who had not entered into contracts.

In September of that year appellants filed new rate schedules, effective October 3, 1935, which continued the contract rate system. Thereupon the Secretary vacated his order of July 3rd and made an order suspending the schedules and directing a second hearing concerning the lawfulness of the contract rate system. On this hearing new evidence was introduced, and relevant portions of the evidence adduced on the previous hearing were spread upon the record. In a report reviewing this record, the Secretary found that the "real purpose of the suspended rates . . . is to prevent shippers from using the lines of other carriers and to discourage all others from attempting to engage in intercoastal transportation from and to the Gulf." He accordingly found the rates unduly prejudicial and ordered their cancellation.

The present suit was brought in the District Court for the District of Columbia, three judges sitting, to set aside the order of the Secretary as without his statutory authority and because not supported by substantial evidence. From the decree of the district court sustaining the Secretary's order, 18 F. Supp. 25, the case comes here on appeal under § 31 of the Shipping Act, 39 Stat. 738, 46 U. S. C. § 830, and the Act of October 22, 1913, 38 Stat. 220, 28 U. S. C., § 47. Appellants here, as in the court below, have assigned as error that the Secretary was without authority to make the order under review because the Executive Order of June 10, 1933, No. 6166, § 12, which abolished the United States Shipping Board and transferred its functions to the Department of Commerce, was without constitutional and legislative authority, and because the findings and order of the Secretary were without support in the evidence.

*First.* Since the appeal was taken, the contention that the transfer to the Secretary, by Executive Order (No. 6166, § 12), of powers conferred by the Shipping Act on the United States Shipping Board, was unauthorized by the terms of Title 4 of the Legislative Appropriation Act

of June 30, 1932, 47 Stat. 413, as amended, 47 Stat. 1517, has been put at rest by the decision of this Court in *Isbrandtsen-Moller Co.* v. *United States, ante,* p. 139. There we held that the failure of Congress, if any, to express its will in the earlier act had been remedied by various later acts mentioning the Executive Order, and making appropriations to the Department of Commerce for payment of the expenses of carrying out the provisions of the Shipping Act,[1] and by § 204 (a) of the Merchant Marine Act of June 29, 1936, 49 Stat. 1985, which referred to functions of the former Shipping Board as "now vested in the Department of Commerce pursuant to § 12 of the President's Executive Order No. 6166," and transferred them to the newly-constituted United States Maritime Commission.

To dispose of further contentions also urged here, that Congress was without constitutional power to delegate to the President authority to determine whether the transfer should be effected, and that he did not exercise it in a constitutional manner, the Court found it enough that the order of the Secretary, which the Maritime Commission had continued in effect, had "determined no rights and prescribed no duties" of the carrier. The rate order here is of a different sort and we face the question previously reserved. It is unnecessary now to pass on the efficacy of the transfer by Executive Order, for we are of opinion that as Congress itself had power to abolish the Shipping Board and to require its functions to be performed by the Secretary, it had power to recognize and validate his performance of those functions even though their attempted transfer by Executive Order was ineffectual.

It is well settled that Congress may, by enactment not otherwise inappropriate, "ratify . . . acts which it

---

[1] Act of April 7, 1934, 48 Stat. 529, 566; Act of March 22, 1935, 49 Stat. 67, 99; Act of May 15, 1936, 49 Stat. 1309, 1345.

might have authorized," see *Mattingly* v. *District of Columbia,* 97 U. S. 687, 690, and give the force of law to official action unauthorized when taken. *Wilson* v. *Shaw,* 204 U. S. 24, 32; *United States* v. *Heinszen & Co.,* 206 U. S. 370, 382; *Hamilton* v. *Dillin,* 21 Wall. 73, 96; *Tiaco* v. *Forbes,* 228 U. S. 549, 556; *Rafferty* v. *Smith, Bell & Co.,* 257 U. S. 226, 232; *Charlotte Harbor & Northern Ry.* v. *Welles,* 260 U. S. 8, 11; *Hodges* v. *Snyder,* 261 U. S. 600, 603. And we think that Congress, irrespective of any doctrine of ratification, has, by the enactment of the statutes mentioned, in effect confirmed and approved the exercise by the Secretary of powers originally conferred on the Shipping Board.

The mere fact that the validation is retroactive in its operation is not enough, in the circumstances of this case, to render it ineffective. In *Graham & Foster* v. *Goodcell,* 282 U. S. 409, 429, this Court recognized that a distinction must be taken "between a bare attempt of the legislature retroactively to create liabilities for transactions . . . fully consummated in the past . . . and the case of a curative statute aptly designed to remedy mistakes and defects in the administration of government where the remedy can be applied without injustice." And see *Hecht* v. *Malley,* 265 U. S. 144, 164. Here the retroactive application of the curative act impairs no substantial right or equity of appellants; their rights to an administrative hearing and determination, and to a judicial review, have been as fully preserved as if the act had been adopted at the date of the Executive Order. The proceedings were conducted by the Secretary in the name of the United States, cf. *United States* v. *Heinszen & Co., supra,* at 385, by virtue of the 1932 Act and the Executive Order. The consequences of the validating statute are free of the elements of novelty and surprise which have led to condemnation, as unreasonable and arbitrary, of other retroactive legislation. See

*Milliken* v. *United States,* 283 U. S. 15, 21; *United States* v. *Hudson,* 299 U. S. 498. We conclude that the Secretary's exercise of the powers conferred on the Shipping Board has been sanctioned by Congress.

*Second.* Section 16 of the Shipping Act declares that "it shall be unlawful for a common carrier by water," subject to the Act, "to make or give any undue or unreasonable preference or advantage to any particular person, locality or description of traffic in any respect whatsoever or to subject any particular person, locality or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." [2] The differential between appellants' rates on commodities transported under contract and the rates on the same commodities for non-contract shippers was prima facie discriminatory since the two rates were charged for identical services and facilities, and the narrow issue presented to the Secretary for decision was whether, in the conditions affecting the traffic involved, the discrimination was undue or unreasonable.

As pointed out by this Court in *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474, the provisions of the Shipping Act which confer upon the Shipping Board authority over rates and practices of carriers by water, and prescribe the mode of its exercise, closely parallel those of the Interstate Commerce Act establishing the corresponding relations of the Interstate Commerce Commission to carriers by rail. Both have set up an administrative agency to whose informed judg-

---

[2] See also Shipping Act, § 15, 39 Stat. 733, 46 U. S. C. § 814 (the Shipping Board may cancel or modify any agreement between a carrier and another carrier or person subject to the Act, which it finds to be unjustly discriminatory); § 17, 39 Stat. 734, 46 U. S. C. § 816 (the Board may order discontinuance of discriminatory rates charged by carriers in foreign commerce); § 18, 39 Stat. 735, 46 U. S. C. § 817 (whenever the Board finds that any classification is unjust or unreasonable, it may order a just and reasonable one enforced).

ment and discretion Congress has committed the determination of questions of fact, on the basis of which it is authorized to make administrative orders.

Such determinations will not be set aside by courts if there is evidence to support them. Even though, upon a consideration of all the evidence, a court might reach a different conclusion, it is not authorized to substitute its own for the administrative judgment. See *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457, 481; *Pennsylvania Co.* v. *United States,* 236 U. S. 351; cf. *United States Navigation Co.* v. *Cunard S. S. Co., supra,* 484. Whether a discrimination in rates or services of a carrier is undue or unreasonable has always been regarded as peculiarly a question committed to the judgment of the administrative body, based upon an appreciation of all the facts and circumstances affecting the traffic. *Manufacturers Ry. Co.* v. *United States, supra; Pennsylvania Co.* v. *United States, supra,* 361; *Seaboard Air Line Ry. Co.* v. *United States,* 254 U. S. 57, 62; *Pennsylvania R. Co.* v. *International Coal Co.,* 230 U. S. 184, 196; *Nashville, C. & St. L. Ry.* v. *Tennessee,* 262 U. S. 318, 322.

In determining whether the present discrimination was undue or unreasonable the Secretary was called upon to ascertain whether its effect was to exclude other carriers from the traffic, and if so, whether, as appellants urge, it operated to secure stability of rates with consequent stability of service, and, so far as either effect was found to ensue, to weigh the disadvantages of the former against the advantages of the latter. This was clearly recognized in the report upon which the present order is based. It states that the danger of cut-throat competition was lessened by § 3 of the Intercoastal Shipping Act of 1933, and that the contract system tends to create a monopoly. In view of the assurance of reasonable rate stability afforded by the Act of 1933, the Secretary concluded that this was the real purpose of the contract rate.

Before the enactment of the Shipping Act in 1916, there was no Congressional regulation of rates and practices of water carriers. By § 16 of the Act, the carriers were required to file only their maximum rates, which left them free to indulge in rate wars. Under §§ 2 and 3 of the Intercoastal Shipping Act of 1933, they are required to file schedules specifying their rates, which are subject to change only on thirty days' notice, and to examination by the Board as to their lawfulness, with power in it to suspend the rate pending investigation. We cannot say that cut-rates for "tramp" and "distressed" tonnage, which, according to appellants' witnesses, are the principal menace to rate stability, would not be substantially deterred by these requirements. The chairman of the Conference admitted that the 1933 statute "has to a certain extent eliminated the condition necessitating the contract rate system." In addition may be mentioned the testimony of shippers who favored the contract rate system, but admitted that they had had no difficulty with the stability of the service in their shipments from Atlantic ports, where the conferences have not adopted a contract system. We think there was evidence from which the Secretary could reasonably conclude that there was little need for a contract rate system to assure stability of service.

On the other hand, there was substantial evidence from which the Secretary could infer that the contract rate system would tend to give to the Conference carriers a monopoly by excluding competition from new lines. The secretary of the Conference testified that approximately 64% of the west-bound port to port tonnage moved under the contract rate. Representatives of lines not members of the Conference stated that the tonnage left was not enough to make the operation of a new line profitable, and that the contract system precluded the employment of their idle steamers in the Gulf trade. The

Conference chairman admitted that it would "not be easy" for a new line to enter the Gulf service because it "is now adequately tonnaged," and that the contract system restricted the amount of available tonnage. He suggested that a competing line might be able to get tonnage if it offered as much as a 10% rate reduction, but admitted that it probably could not operate successfully at such a rate.

It also appeared, contrary to the assertion of appellants, that competing lines were not free to enter the Conference. By the provisions of the Conference agreement, it is prerequisite to admission that the applicant shall be engaged in the general cargo trade from the Gulf to the Pacific. There was testimony that the Conference had denied admission to a line because it did not have an established service in the Gulf, although at the time when it applied for membership it had idle vessels and "offices and facilities" for conducting the business. It is an admissible inference from the evidence that a new line, to secure admission to the Conference, must either be able successfully to compete with the Conference lines at the start, notwithstanding the restriction of the contract rate, or must subject itself to a loss before it can qualify for admission.

There was thus evidence before the Secretary which tended to show that the contract rate system, by reason of the conditions prevailing in the traffic, had established a practical monopoly of cargoes moving from the Gulf ports to ports on the Pacific coast, from which competing carriers were excluded by the provisions of the Conference agreement, except on terms which were practically prohibitive, and that, since the adoption of the Intercoastal Shipping Act of 1933, stability of service, which appellants urge as justification for the system, could be secured without a contract rate. As the Secretary has in-

terpreted the evidence, the operation of the contract system, in the circumstances of this case, does not differ substantially from that of "deferred rebates" outlawed in both foreign and coastwise shipping by § 14 of the Shipping Act, 39 Stat. 733, 46 U. S. C. § 812.[3]

Even though, as appellants seem to argue, the evidence may lend itself to support a different inference, we are without authority to substitute our judgment for that of the Secretary that the discrimination was unreasonable.

*Affirmed.*

MR. JUSTICE SUTHERLAND dissents.

---

[3] Section 14 of the Shipping Act defines the term "deferred rebate" as "a return of any portion of the freight money by a carrier to any shipper as a consideration for the giving of all or any portion of his shipments to the same or any other carrier, or for any other purpose, the payment of which is deferred beyond the completion of the service for which it is paid, and is made only if, during both the period for which computed and the period of deferment, the shipper has complied with the terms of the rebate agreement or arrangement."

The report of the House Committee on Merchant Marine & Fisheries, H. R. Doc. 805, 63rd Cong., 2d Sess. (1914), recommended (p. 307) the prohibition of deferred rebates, adopted in § 14 of the Shipping Act, because it operated to tie shippers to a group of lines for successive periods, and because the system "is unnecessary to secure excellence and regularity of service, a considerable number of conferences being operated today without this feature." See, e. g., pp. 103–105, 200. The Committee recognized that the exclusive contract system does not necessarily tie up the shipper as completely as "deferred rebates," since it does not place him in "continual dependence" on the carrier by forcing his exclusive patronage for one contract period under threats of forfeit of differentials accumulated during a previous contract period. Accordingly the Committee did not condemn the contract system completely. Cf. W. T. Rawleigh Co. *v.* Stoomvaart, 1 U. S. S. B. 285. The policy of the statute may properly be applied where, as in the circumstances of this case, the contract system must be taken as actually operating to effect a monopoly. Cf. Eden Mining Co. *v.* Bluefields Fruit & S. S. Co., 1 U. S. S. B. 41.