S. L. SHEPARD & CO. v. AGWILINES, Inc.
No. 160.

District Court, E. D. South Carolina.
June 13, 1941.

S. L. Einhorn, of Philadelphia, Pa., and Jefferies & McLeod, of Walterboro, S. C., for plaintiffs.

A. T. Smythe, of Charleston, S. C., for defendant.

WYCHE, District Judge.

This case is based upon loss suffered by the plaintiffs, who are partners, by reason of deterioration in a shipment of four thousand, two hundred and eighty-six (4,286) crates of watermelons made by the plaintiffs on one of the vessels of the defendant from Charleston, South Carolina, to New York City, on July 8, 1939. Plaintiffs allege in their amended complaint that the defendant orally represented and agreed that if the plaintiffs allowed it to transport the watermelons to the New York market, that the watermelons would be placed in pre-cooled compartments and carefully handled and refrigerated until delivered at destination, and that as a consequence of and in compliance with defendant's representation and agreements, the melons were delivered by the plaintiffs to the defendant for carriage. They further allege that the defendant failed to use reasonable care, due diligence and exertion in transporting the shipment, but that it negligently and wrongfully handled the melons so that upon their arrival in New York, they had been

bumped, bruised, battered, cut, gouged and broken, and were decayed and suffering from rot, that the melons were mishandled and wrongfully handled on the Charleston dock by the defendant, its agents and servants, were negligently exposed to rain and sun and roughly handled and treated by defendant's agents and servants, were placed in the hold of defendant's vessel, which had not been pre-cooled, as the defendant had agreed to do, were negligently and carelessly stacked and packed in the said vessel, that the hold of the vessel was not refrigerated in transit, as the defendant had agreed to do, and as it knew or should have known was necessary to keep the melons in good condition, that the part of the vessel in which the melons were stored and transported was kept at an unreasonably high temperature, which defendant knew or should have known would cause said watermelons to decay and rot, and that as a result of the defendant's wrongful handling, the melons arrived in New York in a generally damaged and decayed condition, and were there further negligently mishandled by the defendant's agents and servants in unloading.

The defendant in its answer set up among other defenses: (a) That any arrangement between the defendant and the plaintiffs for refrigeration or pre-cooling in connection with the shipment of melons was without charge by the defendant, gratuitous, without consideration and, therefore, not enforceable. (b) That any such arrangement between the defendant and the plaintiffs was not in accordance with the published tariffs applicable to such shipments and the bills of lading issued by the defendant to the plaintiffs covering the said shipment, constituted a gratuitous departure from the terms of said bills of lading and said tariffs and is, therefore, unenforceable. (c) That any lack of condition in the melons· upon their arrival in New York was due to inherent defects in them at the time of their delivery to the defendant, and to the fact that they were infected with certain plant diseases and to their having been too ripe for shipment and to their not having received proper and adequate disease prevention treatment and to the fact that some of the melons had been picked several days before their delivery at Charleston; and had been exposed to the summer heat during that time, and were delivered to defendant at Charleston three days before the vessel was scheduled to sail, and remained on defendant's dock for said period without refrigeration, defendant having no refrigeration facilities on its dock, all of which was well known to plaintiffs at the time of such delivery.

At the conclusion of all the evidence defendant moved for a directed verdict upon the following grounds:

1. There is no substantial evidence to support recovery by the plaintiffs.

2. The evidence is so overwhelmingly against the plaintiffs as to leave no room to doubt what the fact is.

3. Under the Harter Act, 46 U.S.C.A. § 190 et seq., if the defendant in this case exercised due diligence to make its vessel in all respects seaworthy and properly manned, equipped and supplied, the defendant is not responsible for loss resulting from inherent defect, quality or vice of the thing carried, or from any act or omission of the shipper or owner of the goods.

4. There is no charge in the complaint in this case nor in the testimony that the defendant did not use due diligence in the particulars referred to above, and that question is, therefore, not in the case.

5. The uncontradicted testimony under the certificates of Caldwell and Clark, and under the expert testimony of Nusbaum is that these melons were infected with stem end rot and anthracnose before delivery to defendant since there was no way in which they could have contracted either of these diseases after such delivery. The inspection certificates of the inspectors in New York show that certain of the melons were infected with anthracnose and stem end rot upon arrival in New York, and that such of the melons as were not so affected were sound. There is total lack of proof as to· any broken or cracked melons or as to there being anything wrong with the melons except these diseases.

Upon the opening of plaintiffs' case, and before the bills of lading were offered in evidence, one of the plaintiffs undertook to testify as to an oral agreement between her and George J. Horner, one of the officials of the defendant, to the effect that the defendant had agreed to pre-cool space on the vessel in which to put the melons and to transport them under refrigeration in accordance with the allegations of the complaint. I admitted the testimony tentatively, but after further argument, I concluded that the testimony should have been excluded and instructed the jury

to disregard it. My reason for reaching this conclusion is that by the Act of Congress known as the Shipping Act, 46 U.S. C.A. § 815, it is made unlawful for a common carrier by water subject to the Act (and the defendant is subject to that Act) to make or give any undue or unreasonable preference or advantage to any particular person, locality or description of traffic in any respect whatsoever or to subject any particular person, locality or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. It has further been held that the Shipping Act is a comprehensive measure bearing a relation to common carriers by water substantially the same as that borne by the Interstate Commerce Act to interstate common carriers by land, and that the settled construction in respect of the earlier Act must be applied to the later one. United States Navigation Co. v. Cunard S. S. Co., 284 U.S. 474, at page 481, 52 S.Ct. 247, 76 L.Ed. 408. It has been held in numerous cases brought under the Shipping Act and under the Interstate Commerce Act that any special arrangement between a common carrier and a shipper calling for service other than that provided for in the published tariffs and bills of lading is unlawful and not enforceable, as violative of the express provisions of these statutes. The cases in support of this proposition are too numerous for comprehensive citation, but among them are the following: Swayne & Hoyt v. United States, 300 U.S. 297, at page 303, 57 S.Ct. 478, 81 L.Ed. 659; Armour Packing Co. v. United States, 209 U. S. 56, at page 72, 28 S.Ct. 428, 52 L.Ed. 681; Chicago & A. R. Co. v. Kirby, 225 U.S. 155, at page 162, et seq., 32 S.Ct. 648, 56 L.Ed. 1033, Ann.Cas.1914A, 501; Atchison, T. & S. F. Co. v. Robinson, 233 U.S. 173, at page 177, 34 S.Ct. 556, 58 L.Ed. 901; Southern Railway Co. v. Prescott, 240 U.S. 632, at pages 637, 638, 36 S.Ct. 469, 60 L.Ed. 836; Georgia, F. & A. R. Co. v. Blish Milling Co., 241 U.S. 190, at page 197, 36 S.Ct. 541, 60 L.Ed. 948; Missouri, K. & T. R. Co. v. Ward, 244 U.S. 383, at page 388, 37 S.Ct. 617, 61 L.Ed. 1213; Davis v. Cornwell, 264 U.S. 560, 44 S.Ct. 410, 68 L.Ed. 848; Davis v. Henderson, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182; Chesapeake & O. R. R. Co. v. Westinghouse, Church, Kerr & Co., 270 U.S. 260, 46 S.Ct. 220, 70 L.Ed. 576, and many other cases.

The testimony was also, in my opinion, inadmissible in view of defendant's objection that testimony as to such an oral agreement would tend to alter the terms of the bills of lading issued by the defendant to the plaintiffs and constituting the contract between the parties. This proposition is also sound law and is supported inter alia by the following authorities: South Carolina Asparagus Growers' Ass'n v. Southern Railway Co., 4 Cir., 46 F.2d 452; The Arpillao, 2 Cir., 270 F. 426; John Vittuci Co. v. Canadial Pac. Railway, D.C.Washington, 238 F. 1005; Vanderbilt v. Ocean Steamship Co., 2 Cir., 215 F. 886; Inman & Co. v. S. A. L. Ry. Co., C.C.Georgia, 159 F. 960, and other cases. The allegations of plaintiffs' amended complaint are that the alleged contract was oral and the undisputed evidence was that nothing had been paid or agreed to be paid for the extra service, that the shipment had moved under certain specified tariffs which were introduced in evidence and which contained no provision as to refrigeration, that the defendant company had no published tariffs providing for refrigerating shipments from Charleston to New York, and the bills of lading which were put in evidence contained no provision for refrigeration.

Plaintiffs relied upon the Act of Congress known as the Harter Act, 46 U.S.C.A. §§ 190 and 192, and took the position that the defendant, under those sections, could not stipulate against liability for loss arising by reason of negligence, fault or failure in proper loading, stowage, custody, care or proper delivery, that liability for any of these causes was inescapable, that the law makes the carrier an insurer so far as these elements are concerned and that the loss arose by reason of them. Defendant, on the other hand, relied upon Section 192 of the Act, which provides: "If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from * * * the inherent defect, quality, or vice of the thing carried * * * or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative."

There is no allegation in the amended complaint, nor was there any charge in the testimony of the plaintiffs that the defend-

ant had in any way failed to exercise due diligence to make the vessel seaworthy, and properly manned, equipped and supplied, and defendant, therefore, was in position to claim and to enjoy the protection of the provisions of section 192, exempting it from liability for the causes of loss in that section enumerated. Defendant urged that the loss occurred by reason of the fact that the melons were infected with plant diseases before they were delivered to it, and that the plaintiffs failed to take proper precautions in the way of treating these melons against plant diseases before delivering them to defendant, and that they were cut and exposed to the July heat both at Ehrhardt, South Carolina, where they were purchased by plaintiffs from the growers, and at Charleston, for too long a time before the voyage to New York, and that the melons were over-ripe.

While the plaintiff, Mrs. White, in her original testimony and in her effort to prove the oral contract for refrigeration above referred to, did testify as to a conversation between herself and Mr. Horner, in the course of which she stated that Mr. Horner agreed to pre-cool space on the ship and to transport the melons to New York at a maximum temperature of fifty (50) degrees, both Mr. Horner and Mr. Bledsoe, also a representative of the defendant, whose depositions were taken and read to the jury, testified that Mrs. White had solicited them to carry the melons from Charleston to New York under refrigeration and that they had declined to accept the shipment for the reason that in their opinion the refrigerating equipment on the vessel was not strong enough to take the field heat out of the melons, that there was no precooling plant at Charleston where this could be done before the melons were put on board and that they did not think that transporting them under refrigeration without such pre-cooling would be satisfactory, and that only upon Mrs. White's continued insistence that they should accept the shipment did they finally consent to do so, but this was after the facts above set out had been repeatedly brought to her attention and the risk of shipping under refrigeration without pre-cooling had been made clear to her.

Plaintiffs did not undertake to contradict this testimony of Mr. Horner and Mr. Bledsoe. Under these circumstances, I reached the conclusion that their testimony was in line with the facts, and that the melons had been shipped under the circumstances described by them.

Defendant further offered in evidence and read to the jury the deposition of Alex M. Morrison, the chief engineer of the ship upon which the melons had been carried, and of John W. Andrews, a refrigerating expert in the employ of the defendant, who had installed the refrigerating machinery upon the vessel in question. Defendant introduced in evidence the temperature chart which had been kept by Morrison on the voyage from Charleston to New York and which showed the temperature readings taken every four hours in the compartments in which the melons were being carried. He testified from this chart, from the fact that he had been chief engineer on the vessel at the time and was familiar with what had occurred, and from his general knowledge of the refrigerating equipment on the ship, and that equipment had been operating throughout the entire voyage at its maximum capacity, that there was nothing the matter with it, that nothing further could have been done than was done to make the melons colder while in transit and that adequate space to contain the number of crates of watermelons which were expected had been pre-cooled by turning on the refrigerating machinery in that space when the vessel left Jacksonville, keeping it on until arrival in Charleston. Mr. Andrews testified that from an examination of the temperature chart, from his knowledge of the refrigerating machinery on the ship and from his general knowledge of refrigeration, the chart showed proper performance by the refrigerating machinery during the voyage and that he knew of nothing further that could have been done to bring the melons to a lower temperature. Both of these witnesses laid great stress upon the inability of the vessel's machinery to take the field heat out of 4,286 crates of watermelons, which had not been pre-cooled, during the short voyage from Charleston to New York, and both testified that perishables coming on board vessels of the defendant at Jacksonville for shipment from that port to New York under refrigeration are pre-cooled at a pre-cooling plant operated by the defendant at Jacksonville before they are put into the vessel.

Plaintiffs offered no testimony going to show any defect in the refrigerating mechanism of the vessel, or in its performance, or that the melons could have

been made cooler than was done, but merely submitted that the melons were not chilled enough, as shown by the chart, and that this was the defendant's fault. In my opinion, under the testimony, the mere fact that the melons were not made as cold as plaintiffs would have liked to have had them raises no presumption of any negligence or wrong doing on the part of the defendant, and convincing testimony offered by it, as outlined above, is the other way. I am satisfied, therefore that there was nothing in the case to show that the shipment had in any way been mishandled so far as refrigeration is concerned.

■■ Plaintiffs further sought to prove that the melons had been improperly stowed. Their testimony in support of this, however, was limited to the statement of the plaintiff, Mrs. White, in her direct evidence that she went down into the hold of the ship upon its arrival in New York before the melons had been taken out, and that the melons had been stowed in a solid mass. Against this testimony, however, is the testimony of Demetrio Vega, the Chief Stevedore of the defendant at Charleston, that he supervised the stowage of these melons which were shipped in crates packed in excelsior, two or three melons to a crate, that the bottom tier of crates rested on strips of scantling to keep them off the floor, that strips of wood an inch to an inch and a half square were laid across the top of each tier of melons so as to keep them separated and to allow the air freely to circulate, that each pile of melons was stowed a few inches away from the next pile, that the melons were not piled snugly against the sides of the ship nor did they reach to the ceiling. This testimony is supported by the statement of Mr. Morrison, the engineer, who saw the melons stowed and whose duty carried him into the space where they were, and the Court will take judicial notice of the necessity of piling these crates of melons reasonably close in order to prevent their falling about and being damaged should the ship encounter heavy weather. Plaintiffs also sought to show wrongful stowage in that Mr. Vega testified that the crates were stacked on edge, so that the melons packed in them were resting on their ends rather than on their sides. There was introduced in evidence, however, a photograph which showed how the melons had been packed in the crates and how they looked when they were delivered to the defendant. From this photograph it appears that the melons were tightly packed in excelsior, both underneath, at the sides and between the ends of the melons and the sides of the crates, so that when the crates were turned on their edges the melons rode on a cushion of excelsior. There was not a sufficient showing by the plaintiffs of improper stowage. It may very well be that when Mrs. White entered the hold of the vessel the melons having been stowed by Mr. Vega as he described, she gained the impression that they were in a solid mass. Mr. Vega's testimony and that of Mr. Morrison was clear, convincing and satisfying to me, and I am of the opinion that the fact that the melons were packed tightly in excelsior in their respective crates might of itself have interfered with the passage of air among them.

■ Plaintiffs also sought to show rough handling of the melons both in Charleston and upon arrival in New York, but the evidence to the contrary was so overwhelmingly against the plaintiffs as to leave no room to doubt what the fact is, and there was no substantial showing that any damage to the watermelons was caused by rough handling. Garrison v. United States, 4 Cir., 62 F.2d 41.

■ There remains, therefore, for consideration the defenses interposed of vice in the melons and omission on the part of the plaintiffs in their handling.

These melons were inspected at Ehrhardt before they were taken to Charleston by two United States Government Inspectors, Gilbert Clark and George M. Caldwell. Mr. Clark testified that he had inspected the melons and had graded them as for the most part U. S. No. 1's, the remainder U. S. No. 2's. He testified that U. S. No. 1 melons: "consist of watermelons of similar varietal characteristics which are mature, but not overripe, well formed, and free from decay, white heart, anthracnose, and from damage caused by other diseases, sunburn, insects or mechanical or other means. In order to allow for variations incident to proper grading, not more than ten per cent by count may be below the requirements of this grade."

He testified that U. S. No. 2's are: "watermelons of similar varietal characteristics which are mature, but not overripe, which are not badly misshapen and which are free from decay, white heart and from serious damage caused by sunburn, disease, insects, mechanical or other means. In or-

der to allow for variations incident to proper grading and handling, not more than ten per cent by count may be below these requirements." He also testified that the expression, "free from damage" means that melons are not injured to an extent readily apparent upon examination, and that serious damage is an injury which affects the edible quality of the melon or which detracts materially from its appearance. He further testified that in order for melons to grade as U. S. No. 1's there may be as many as one melon in ten showing anthracnose spots, provided it does not show more than fifteen spots per melon, and if such spots are elevated, and that in order for a lot of melons to grade as No. 2's, every melon in the lot can show anthracnose spots, provided it does not show over fifteen spots per melon and they are elevated spots.

Mr. Caldwell, who had examined the remainder of this lot of melons and had graded them in the same way, testified as to the correctness of these definitions and grading requirements. It thus appears that so far as the certificates issued by Messrs. Caldwell and Clark are concerned, the melons may have been infected with anthracnose to the extent above set out. Both of these inspectors also testified that the stems of the melons had not been freshly cut and treated with bluestone solution as a precaution against the disease of stem end rot or diplodia. L. E. Morningstar, an experienced melon grower, purchaser and shipper of Ehrhardt, testified as to the rapid advance which anthracnose may make in a shipment of melons infected with this disease after it has been inspected, and of the heavy losses suffered by the melon growers of that vicinity from the advance of this disease during transit. Mr. Clark, Mr. Caldwell and Mr. Morningstar all testified that the recognized method of preventing stem end rot in watermelons is to cut the stem close to the melon after it has been brought in from the field and to daub the freshly cut stem end with bluestone solution. One of the plaintiffs, Mr. S. L. Shepard, who had had personal supervision of the purchasing of the melons and their shipment from Ehrhardt, testified that this bluestone treatment had not been given to the melons in question.

Defendant's counsel put on the witness-stand Dr. Charles J. Nusbaum, a graduate of the University of Wisconsin, and an expert in plant diseases, being in charge of the South Carolina Crop Experiment Station at Blackville, South Carolina, about twenty miles from Ehrhardt, who has specialized in the study of watermelon diseases. Dr. Nusbaum testified that he is thoroughly familiar with watermelon conditions in the Ehrhardt section, and that anthracnose had been prevalent in that section in 1939, and in fact, in every season since 1936. He testified that anthracnose is a germ disease and that it is acquired by the melons in the field, and in its early stages it is difficult to detect and that the fact that a melon has this disease may escape the observation of an inspector. He further testified that the disease advances rapidly after the melons have been delivered for transportation and that heavy losses are experienced in shipments of melons from Ehrhardt. This was borne out by the testimony of Mr. Morningstar.

Dr. Nusbaum also testified that stem end rot or diplodia is also a germ disease, entering the melon in the field through the opening caused by severing the stem of the melon to detach it from the vine. He testified that the recognized and effective treatment to prevent the germs of this disease working up through the stem and entering the melon is to cut the stems and treat them with bluestone, as described above, and a bulletin of the United States Department of Agriculture to the same effect was offered in evidence by the defendant.

Mr. Morningstar also testified, and this was not contradicted by Mr. Shepard, who took the stand in reply, that the melons had been piled too high on the platform at Ehrhardt awaiting shipment and that they had been kept there several days because the supply of crates had been exhausted and additional crates had to be secured.

Upon the arrival of these melons in New York, they were again inspected by three United States Government Inspectors, on July 10th, by Simon Lieberman and F. L. Southerland, and such as remained on the dock again on July 12th, by L. D. Mills and F. L. Southerland. The certificates issued by these inspectors were offered in evidence by plaintiffs and the language of the certificates is to my mind conclusive as to what was the difficulty with the melons. The certificate showing the inspection made on July 10th states: "Condition: Stock that is free from Anthracnose and Soft Rot is firm, fresh appearing, and shows good characteristic green color. Average approximately 25% of melons show anthrac-

nose in all stages, mostly in advanced stage, occurring mostly in numerous sunken spots in some instances thinly scattered sunken spots, some instances blister stage raised spots. Average approximately 12% Soft rot. Soft Rot is generally Stem End Rot (Diplodia) few instances Fusarium Rot, both rots mostly in advanced stage, few instances in early stages." The certificate setting out the result of the examination made on July 12th shows the following: "Condition: Stock that is free from Anthracnose and Soft Rot is firm, fresh appearing and shows good characteristic green color. Average approximately 35% of melons show Anthracnose occurring mostly as numerous sunken spots in advanced stage, in some instances spots have coalesced, some thinly scattered sunken spots, some blister stage raised spots. Average approximately 25% soft rot. Soft rot is generally Stem End Rot (Diplodia), few instances Fusarium Rot, both rots mostly in advanced stage, few instances in early stage."

The language of these certificates is highly significant. First, it shows the steady advance of the diseases in the melons, the anthracnose having increased between July 10th and July 12th, from 25 per cent. to 35 per cent., and the stem end rot for the same period from 12 per cent. to 25 per cent. In addition the certificates make no mention of any broken, cracked, bruised or gouged melons, but distinctly state that such of the melons as were not infected with anthracnose or stem end rot were firm and fresh appearing.

From this it appears to me to admit of no question that the trouble with these melons which caused the loss of which the plaintiffs complained, was that they were infected with anthracnose and stem end rot. Since the certificates of the examiners at Ehrhardt do not preclude the possibility of the melons having been infected with anthracnose when they were inspected, and since the testimony of Dr. Nusbaum was to the effect that stem end rot has to work its way up through the stem into the melon, which is a process requiring several days, so that in the absence of the bluestone treatment the stem end rot may have been only in the stems when the melons were inspected at Ehrhardt, and since his uncontradicted testimony was that both of these diseases are germ diseases acquired by the melons in the field, and since the plaintiffs put up no testimony to show how the melons could have acquired either of these diseases after their delivery to the defendant, it has, in my opinion, been clearly demonstrated by the testimony that the melons had this inherent vice in them when the carrier received them.

One of the plaintiffs himself testified that he had not applied the stem end treatment to these melons, and since the overwhelming testimony is that this is a well recognized and effective preventive treatment against stem end rot, it also appears beyond question that the entry of this disease into the melons was due to the omission of the shipper. Since both of these causes are specifically set out in the Harter Act above referred to as causes of loss for which the carrier is not responsible, I can see no basis under the testimony for imposing any liability upon the defendant in this case.

The Circuit Court of Appeals for the Fourth Circuit in the case of South Carolina Asparagus Growers' Association v. Southern Railway Co., 46 F.2d 452, 453, laid down this rule: "The rule has been uniformly laid down by the United States Supreme Court that the trial judge not only may but should direct a verdict where the evidence is of such a conclusive character that if a verdict were rendered for one party, whether plaintiff or defendant, it would have to be set aside in the exercise of a sound judicial discretion. What is known as the scintilla rule has never been approved by the federal courts."

Since, if this case had been submitted to the jury and a verdict for the plaintiffs had been rendered, I would have felt constrained in the exercise of sound judicial discretion to set such verdict aside, it was under this pronouncement incumbent upon me to direct a verdict for the defendant, which was accordingly done.

Let judgment be entered for the defendant against the plaintiffs in the amount of the freight and unloading charges covering the shipment, which amount was counterclaimed by the defendant, proven by it, admitted by the plaintiffs to be correct, and unpaid, and included in the verdict found by my direction, and for the costs.