**NATIONAL LABOR RELATIONS BOARD v. SWAN FASTENER CORP.**

No. 4648.

United States Court of Appeals First Circuit.

Heard Oct. 7, 1952.

Decided Nov. 18, 1952.

T. Lowery Whittaker, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Arnold Ordman, and William J. Avrutis, Attys., Washington, D. C., with him on the brief), for petitioner.

Bernard A. Riemer, Boston, Mass. (Cohn, Riemer & Pollack, Boston, Mass., with him on the brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

The National Labor Relations Board, pursuant to the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., has petitioned this court for enforcement of its order of July 24, 1951, under § 10(c) of the Act, against the respondent Swan Fastener Corporation.

The respondent is a Massachusetts corporation and is engaged in the manufacture of zippers in Cambridge. It concedes that it is engaged in commerce within the meaning of the Act.

A complaint and notice of hearing, dated June 29, 1950, was issued against the respondent, based on charges filed by Lodge 264 of District 38 of International Association of Machinists (IAM) that the respondent had engaged in certain unfair labor practices affecting commerce. The respondent filed its answer July 14, 1950 denying the alleged unfair labor practices and hearings were held before the trial

examiner on 17 days in July and August, 1950.

The trial examiner issued his intermediate report on January 26, 1951, finding that respondent had engaged in certain unfair labor practices and recommended that it cease and desist therefrom and take certain affirmative action.

The Board considered the intermediate report and the entire record and concluded that the respondent violated § 8(a) (1) and (3) of the Act and issued the remedial order now before us which in substance ordered the respondent to cease and desist from certain unfair labor practices and to take certain affirmative action relative to offering eight employees, discriminatorily discharged, immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or rights and privileges and to make said employees whole for any losses of pay they may have suffered by reason of the respondent's discrimination against them.

Testimony offered by the Board tends to show the following: During the noon hour on October 13, 1949, five employees of the respondent met with a representative of IAM near the respondent's plant and signed and delivered to him membership applications in IAM. They received additional application cards and at the end of the day began a campaign to enroll fellow workers. By the following week the IAM organizing group comprised eight employees, namely, Donald Blair, Stanley Doyle, Edward d'Entremont, Martin Moore, Frank Karavetsos, Lester Stevens, Stanley Barnette and Lois Blair, a sister of Donald. The men were employed as lacers and cutters and Lois as a machine operator.

The organizing committee met regularly at lunch near the plant's laundry section where they turned over application cards to either Moore or Blair and discussed employees to be solicited and the progress of the organizing campaign.

On October 18 to 20 these noon meetings were observed by William Cravatts a foreman in the assembly section and son of the general manager, Robert Cravatts, and Irving Gilman, production manager.

On October 19, an IAM representative went to the respondent's office and introduced himself to William Cravatts and told him that he represented a majority of the employees and asked for a bargaining conference. William replied that his father Robert, the general manager, who usually handles such matters, was absent from the plant. On October 19 the respondent was further advised by the Board's Regional Office that the IAM had filed a petition for certification as exclusive bargaining representative of the production and maintenance employees.

After the respondent learned of the union activities, Robert Cravatts asked Keith Whitham, who supervised sections in the assembly department, if he had seen any employees distributing membership applications in the plant during working hours and asked him to inquire among the employees in order to find out how many signed up with the IAM. Whitham made inquiries among employees under him and when one of them hesitated to answer whether he had signed an IAM card, Whitham told him "He knew all about it already." Whitham also warned employees it would be wiser not to take part in union activities because it might lead to trouble and respondent might move to New York if the IAM were successful.

After the union's request for a bargaining conference on October 19, Gilman arranged to see Doucette, Possick and Kelly who were the lead men in the chain room during the plant's three shifts and told them that he knew of the union's organizing efforts and Gilman tried to find out from them which employees were behind the campaign. Gilman asked Kelly whether he signed an IAM card and was informed that he had. Gilman asked him how it would benefit him and said Kelly was "paying union dues for nothing" and accused him of starting the IAM campaign in the plant. Gilman asked the three men to inquire from the employees with whom they worked whether they had signed IAM cards and if so, why. Gilman told these three men the employees would not benefit even if the IAM were successful because

in that event the plant would have to move to New York to save transportation costs.

After Kelly returned to his work, foreman Arthur Quaregan discussed the IAM campaign with him and Kelly told Quaregan about the meeting in Gilman's office and asked Quaregan why the company thought he had started the organizational campaign. Quaregan pointed out that Kelly had been connected with a union during previous employment and Quaregan also stated that Gilman inquired as to who had given Kelly the IAM application card which he had signed and Kelly named Martin Moore, a chain room lacer and member of the IAM organizing group. Quaregan said that the company did not want the union in its plant and left Kelly and walked toward the office and about an hour later Moore told Kelly that he (Moore) had got a layoff slip.

At quitting time on the day Gilman talked to Doucette, Possick and Kelly, employees were told to remain in the plant for a meeting. Barnette and four other members of the IAM organizing committee, Blair, d'Entremont, Karavetsos and Stevens were among those who attended. William Cravatts told the assembled employees that they knew why they were at the meeting and that he knew all of them were in the union. He told the employees that the union could not do them any good because the respondent could not afford to give them any more paid holidays and vacation time and he added that if the IAM succeeded in organizing and should cause "trouble," the respondent would have to move to New York. He stated further that all the union wanted was the employees' "two bucks a month."

At this meeting Lillian Michelman, whom the Board found to be a supervisor in the cutting department, warned the employees that if the IAM drive were successful the respondent could raise the production quota upon which employees' compensation was based and that the respondent would stop all the privileges currently allowed the employees. When this meeting ended Herman Cravatts, brother of William, and also a supervisor in the assembly section, handed Barnette his pay envelope which contained a slip stating that he was being temporarily laid off due to a lull in business.

Three days later, on October 24, at 3:30 p. m., during the change of shifts in the chain room, the respondent assembled the employees of that department to listen to Gilman. He told them that he knew union activity was going on and that he knew which employees were trying to organize the union. Gilman then asked whether they had any complaints about wages or other conditions of employment and advised them to take up such matters with Quaregan or himself.

Lester Stevens, a lacer and one of the IAM organizing committee, reported to work the following morning but did not find his time card in the rack. He questioned Quaregan about his card and Quaregan told him that the respondent was laying him off because of a lull in work. When leadman Kelly voiced his surprise to Quaregan at this dismissal of "a very good worker" and asked "What's the story", Quaregan replied that Stevens "is passing out cards." At quitting time on the same day respondent laid off another IAM committeeman, Donald Blair, also because of a "lull in business." The next day, the respondent, asserting that it was "low on work", discharged Karavetsos, a member of the IAM organizing group.

On November 4, Robert Cravatts called William Cravatts to his office and introduced him to several men. Robert told William that these men wanted to speak to the employees and instructed William to assemble them. The employees were informed that there was to be a meeting at the time clock about 10 a. m. which they were free to attend if they wished.

At the meeting William Cravatts introduced Ralph Roberts, an organizer for the International Ladies Garment Workers Union (ILGWU), who spoke to the employees. Roberts argued that the ILGWU was the proper union for the zipper industry. In response to a question as to what would happen to the employees who would not join this organization if it should be successful in its campaign, Roberts answered "they were out". Neither William Cra-

vatts nor any other supervisory employee present, repudiated this threat. Talks in favor of the ILGWU were also made by a representative of another zipper manufacturer and a shop steward of ILGWU.

Membership application cards in ILGWU were then passed out and were signed by Quaregan, William Cravatts and by a number of employees and returned to the ILGWU organizer. The respondent paid its employees for the time spent at the meeting. The inference drawn by the Board that the respondent sanctioned the ILGWU meeting seems reasonable in the circumstances.

In International Association of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, 78, 61 S.Ct. 83, 88, 85 L.Ed. 50, the Supreme Court said:

"* * * Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure. The freedom of activity permitted one group and the close surveillance given another may be more powerful support for the former than campaign utterances."

On November 10, William Cravatts laid off Doyle and d'Entremont, members of the IAM organizing group.

On November 15 Whitham received a circular which was being distributed to announce an IAM meeting outside the plant for the evening of November 16. On the 16th Whitham asked several of the men working under him whether they were going to attend and when two employees, Barnette and Perkins, said they intended to go, Whitham asked them to let him know what took place there. An employee namd Stover told Whitham that he did not think he would go to the meeting and Whitham replied that it was entirely Stover's choice but that the "higher-ups" would want to know what was going on. On the morning after the IAM meeting, Perkins told Whitham what had been said at the meeting and further informed him that none of the other employees of Whitham's section had attended. Herman Cravatts

went to the meeting hall and tried to attend the IAM meeting. He was seen by a number of respondent's employees who were already present. The IAM representative told Herman he would have to leave the hall or be thrown out. Herman left but remained outside at the entrance for several minutes and while he was standing on the sidewalk several employees approached the hall and saw him there. While at the meeting Herman Cravatts greeted Lois Blair who worked under his supervision. On the day after the IAM meeting, Herman told Lois that her services were no longer needed due to a lull in business. The respondent contends that another reason for her lay off was that she talked too much while on the job and was not getting her work done.

The respondent offered testimony to the effect that it did not coerce its employees by interrogation, surveillance or by other unlawful conduct in the exercise of their rights guaranteed in § 7 of the Act nor that it discriminatorily discharged the eight members of the organizing committee because of their union membership and activities. It attempted to justify the discharges of the said eight employees mainly because of its claim that there was a "lull in business" or for other adequate reason.

The respondent argues that the testimony of the union's witnesses was manufactured to suit their case against the respondent.

In National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368, the Supreme Court said:

"* * * Congress entrusted the Board, not the courts, with the power to draw inferences from the facts. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S. Ct. 307, 311, 84 L.Ed. 396. The Board, like other expert agencies dealing with specialized fields (see Rochester Telephone Corp. v. United States, 307 U. S. 125, 146, 59 S.Ct. 754, 764, 83 L.Ed. 1147; Swayne & Hoyt v. United

States, 300 U.S. 297, 304, 57 S.Ct. 478, 481, 81 L.Ed. 659) has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony."

See National Labor Relations Board v. Kobritz, 1 Cir., 1951, 193 F.2d 8.

 The respondent contends that the Board's findings: (1) that the respondent by interrogation, threats of reprisal, surveillance, and other unlawful conduct interfered with, restrained and coerced its employees in violation of § 8(a) (1) of the Act, and (2) that respondent discriminatorily discharged eight members of the IAM organizing group in violation of § 8(a) (3) are not supported by substantial evidence.

We find no merit in the respondent's contentions and conclude that the Board's findings of violations of § 8(a) (1) and (3) of the Act are supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

A decree will be entered enforcing the order of the Board.