**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DAVIDSON RUBBER COMPANY, Respondent.**

No. 5948.

United States Court of Appeals First Circuit.

July 13, 1962.

James C. Paras, Attorney, Washington, D. C., with whom Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Robert Sewell, Attorney, Washington, D. C., were on brief, for petitioner.

Julius Kirle, Boston, Mass., for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order issued on November 7, 1961, against respondent Davidson Rubber Company, based on the Board's findings that respondent had violated Section 8

(a) (3) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 3) by discharging an employee because of participation in union activities and had violated Section 8(a) (1) of the Act by surveying a union meeting and interrogating employees about letters which the employees had received from the union. The Board's order requires respondent to cease and desist from the violations found and from in any manner interfering with its employees' statutory rights. The order also directs the respondent to reinstate the discharged employee with back pay and to post appropriate notices.

The facts giving rise to the Board's decision and order are as follows. The Davidson Rubber Company, a Massachusetts corporation, (hereinafter called the "Company") is engaged in the manufacture of foam rubber products, including arm rests for automobiles, at its two plants in Dover, New Hampshire. It employs approximately 200 workers. In December, 1960 the United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, (hereinafter called the "Union") began organizational activities among the Company's employees. It appears that a certain Doris Griffin, a Davidson employee, was a conspicuous and active union advocate during the early stages of the organizational efforts. According to the testimony of William H. Stapleton, a union field representative, Miss Griffin was the union's "key person" in the plant.

The record indicates that in addition to generally "talking up" the advantages of union membership among the employees of the Company, she distributed union membership application cards in the lunch room during her break period. On January 27, 1961, approximately ten minutes before the close of the working day, Miss Griffin was told by her supervisor that she would have to be "let go." This discharge forms the basis of the asserted Section 8(a) (3) and (1) violation.

The alleged violations of Section 8(a) (1) stem from the following incidents. On January 17, 1961, a union meeting was held at the home of Patricia March, a former Davidson employee who had been previously discharged by the Company. Stapleton and several union supporters, including Doris Griffin, were present at this meeting. The house adjacent to the March residence is occupied by a Robert Knight, a Company supervisor. A common driveway, approximately ten feet in width, separates the two houses. During the union meeting Knight was seen observing the activities in the March residence from his home. The Board found this to be improper surveillance.

On or about February 17, 1961 union literature and application cards were mailed to the employees at their homes. On the following day the head of the Company's urethane department, George C. Exas, approached employee Armand A. Croteau at his machine and inquired as to whether Croteau had received the union letter and card. When Croteau said that he had, Exas directed him to "pass it in." Exas had already collected several union letters and the record indicates that he ultimately obtained 10–15 letters from employees. Croteau did not have the letter with him. Thereupon Exas asked that he bring it in the following day. The next day Croteau brought his letter, but without the envelope in which it came. Upon Exas' request, Croteau signed his name on the back of the letter and gave it to Exas. This incident generated the "coercion" phase of the Section 8(a) (1) violation.

We shall consider these alleged violations *seriatim*. Doris Griffin worked for the Company from July 27, 1960, until her discharge on January 27, 1961. She was initially hired as a quality control inspector in the urethane department and performed this function for the first five or six weeks of her employ. Following this assignment she was given a number of other tasks by the Company including the training of new inspectors. Around the middle of January she returned to her original job as an inspector on one of the automobile arm rest production lines. Miss Griffin was the last

of nine employees along the line and it was her duty "to see that the arm rests were properly cleaned, inspected and packed." Another employee was responsible for the initial cleaning of the arm rests, but Miss Griffin possessed cleaning supplies in the event that the arm rests required further cleaning.

During the seven months of her employment she had never been reprimanded or critized by her supervisor in any manner. On the contrary, she testified that she had been complimented on her work by department head Exas. The Company's personnel manager, Floyd McDowell, testified that there was nothing in Miss Griffin's employment records which reflected adversely on the caliber of her work.[1] During the course of her employment her pay had advanced from $1.18 to $1.42 an hour by means of the Company's program for periodic pay raises. The record indicates that she almost invariably met or exceeded her production quotas and, on occasion, received additional incentive pay for this performance.

The Company's seniority policy, as articulated in its Employees' Manual, is to lay off employees "according to their plantwide seniority in their classification, except in unusually extenuating circumstances or when their skill or ability is not equal to that of junior employees." According to the manual and established company practice, inspectors had the additional right to "exercise" their seniority in the general factory classification by "bumping" general factory employees with less seniority. At the time that Miss Griffin was discharged the Company retained three inspectors and some 75 to 100 factory employees, all of whom had less seniority than she had. Under Company policy, these junior employees should have been laid off first.[2]

The credited testimony[3] regarding the circumstances surrounding Miss Griffin's discharge shows the following. On Friday, January 27, 1961, at about 4:50 in the afternoon, her supervisor, Leonard Hamilton, informed her that he would "have to let [her] go." When she inquired as to the reason for the discharge, Hamilton said he did not know, that he was only instructed to tell her that she was "let go." Miss Griffin pointed out that there were other inspectors with less seniority than her, but Hamilton was still unable to give her any specific reason for her layoff.

On January 30, the Monday following her layoff, Miss Griffin telephoned McDowell, the personnel manager, inquiring as to the cause of her discharge and why her seniority did not prevail. Thus when she asked whether "poor quality of work or inability" was the reason, McDowell replied that he did not know. When she asked why the normal seniority policy had not been followed, McDowell stated that in her case seniority was "flexible." Miss Griffin then said that she would have to assume that she "was laid off because of union activities;" to which McDowell replied: "You said it, I didn't."

The Company did not recall Miss Griffin but did hire several new inspectors and at least 25–30 new general factory employees between Miss Griffin's layoff on January 27, 1961 and the Board hearing on May 17, 1961. All of the new employees lacked prior experience. The

1. McDowell testified that depending on the individual conduct involved, the employment records might reflect such an entry.

2. McDowell testified that the selection of a senior employee for layoff over those with less seniority was contrary to the normal procedure.

3. Although the testimony of Company witnesses varied from that of the Board on many particulars, the conflicting accounts merely raise a question of credibility which we have often recognized is a matter for Board determination absent an "incredible" result. N. L. R. B. v. C. Malone Trucking, Inc., 278 F.2d 92, 95 (1 Cir. 1960); National Labor Relations Bd. v. Swan Fastener Corp., 199 F.2d 935 (1 Cir. 1952); National Labor Relations Board v. Kobritz, 193 F.2d 8 (1 Cir. 1951); National Labor Relations Board v. Bird Mach. Co., 161 F.2d 589 (1 Cir. 1947).

employees' manual provides that "permanent employees will be recalled to work in inverse order of layoff."

█ Based on the foregoing, the Board concluded that Miss Griffin was discriminatorily discharged because of her union activities in violation of Section 8(a) (3) and (1) of the Act. We believe that substantial evidence on the record as a whole confirms the Board's decision. National Labor Relations Board v. Walton Manufacturing Company & Loganville Pants Company, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, decided April 9, 1962; Universal Camera Corp. v. Labor Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Testifying at the hearing, personnel manager McDowell stated that the policy of the Davidson Company concerning the advent of a union could be summarized as follows: "The Company feels that management, as represented at the present time, can administer to the needs of its members, of its employees, without the need for an outside party. This, I think, is general attitude."

Clearly a statement of such generality does not compel the conclusion that a particular discharge was prompted by an anti-union animus. N. L. R. B. v. Dan River Mills, Incorporated, 274 F.2d 381, 384 (5 Cir. 1960). Still, where the discharge in question involves the "key" employee in an organizational drive, it may supply shape and substance to otherwise equivocal circumstances.

Here there is no question that Miss Griffin was an active union advocate and as the Board found, known to be such by the Company. From all that appears from the Company records there was nothing substandard in her performance during the previous course of her employment. Indeed, it would appear that the fact that she had been selected to train other inspectors would argue against the inference that her work was inferior. Not only was the Company's normal seniority policy disregarded both in her discharge and in the recall of new employees, but under the credited evidence, she was never told specifically what constituted the reason for her discharge. Coming in the midst of a union organizing drive, this disregard for established dismissal procedures in the case of the "key person" in the drive is certainly some indication of anti-union animus. In these circumstances we believe that the Board had ample basis for concluding that the discharge of Miss Griffin resulted from her participation in union activity.

The Company has resisted this finding on the basis that Miss Griffin's layoff on January 27, 1961 was merely temporary as part of an economic curtailment. Thereafter, according to the Company, her separation was made permanent because of the discovery of a host of inferior work which she had inspected and passed. While on the Company's evidence, it might well have been open to the examiner to accept these contentions, on the present state of the record we cannot say his finding that the principal reason for her discharge was union activity is clearly erroneous. See, National Labor Relations Bd. v. Whitin Machine Works, 204 F.2d 883, 885 (1 Cir. 1953).

█ Turning to the Section 8(a) (1) violation, it seems to us that the Board has been exhibiting an extraordinary sensitivity on the subject of surveillance. Cf. N. L. R. B. v. Whitelight Products Div., 298 F.2d 12 (1 Cir. 1961), cert. den., 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed. 2d 288 (1962). As noted above, the union meeting at which the asserted surveillance occurred took place at the home of a Mrs. March, a previously discharged employee admittedly hostile to the Company. Her house was about ten feet from that of Knight, a Company supervisor. According to Mrs. March, on direct examination, Knight sat in a chair in his living room "looking into my kitchen" while the union meeting was going on. Apparently realizing this was not strong enough, on cross-examination, she testified instead that Knight was looking out from under the blinds. On this the Board found improper surveillance constituting "coercion" in violation of Section 8(a) (1).

Seemingly, one's house is one's castle only so long as one does not look out the window. If the union does not want to be seen, it does not need to go next door, and the Board should tell it so rather than cast reflections upon a party's not unnatural curiosity properly exercised in his own home. We disagree with the Board that this conduct violated Section 8(a) (1).

However, we agree with the Board that the conduct of Exas compelling the employee Croteau, to bring in the letter which he had received from the union might be deemed "coercion" within the meaning of Section 8(a) (1). It appears that Exas already knew the contents of the letter and assuredly his request would be regarded by Croteau as far more than a further satisfaction of his curiosity.

A decree will be entered enforcing the order of the Board.